UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,                    09 Cr. 339

          -v.-
                                             OPINION
ANTONIO GUERRERO, et al.,

          Defendants
------------------------------------X


A P P E A R A N C E S:

          Attorneys for Government

          PREET BHARARA
          United States Attorney for the
               Southern District of New York
          86 Chambers Street, 3rd Floor
          New York, NY  10007
          By:  Laurie Korenbaum, Esq.
               Marissa Molé, Esq.


          Attorneys for Defendants

          KELLEY DRYE & WARREN, LLP
          101 Park Avenue
          New York, NY  10178
          By:  Don Buchwald, Esq.

          Frederick H. Cohn, Esq.
          61 Broadway, Suite 1601
          New York, NY 10006

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11 10 09

**Sweet, D.J.**

Defendant Antonio Guerrero a/k/a "Tony" ("Guerrero") has moved to suppress evidence seized from his home in the course of his arrest and a subsequent search of his residence on April 21, 2009, on the grounds that (1) the entry and security sweep by agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") into his residence after his arrest outside his home was illegal; and (2) his consent to allow those agents to search his residence for photographs was involuntarily given

Defendant Edwin Maldonado ("Maldonado") has moved to (1) sever Counts One and Two from Counts Three though Eight of the Indictment; (2) recover from the Government a bill of particulars identifying "known" co-conspirators and specifying the communications "through a facility of interstate commerce" alleged in the Indictment; (3) disallow evidence of Maldonado's April 21, 2009 post-arrest statement; and (4) disclose items allegedly material to the preparation of Maldonado's defense, including various photographs.

2

Upon the facts and conclusions set forth below, a further hearing is required to resolve Guerrero's motion, and Maldonado's motions are denied.

## I. **FACTUAL BACKGROUND**

On April 7, 2009, a federal grand jury in the Southern District of New York returned and filed an indictment (the "Indictment") against Guerrero, Maldonado, Omar Flores ("Flores"), and Johnny Cedeño, a/k/a "Jose Rivera" ("Cedeño") (collectively, the "Defendants")(the "Indictment"). The Indictment charged these four individuals in connection with three separate shootings which occurred in late 1994, and resulted in the deaths of four individuals.

Counts One and Two of the Indictment charged Guerrero with the murder of Livino Ortega (Count One) and Fernando Garrido (Count Two) on or about September 3, 1994, in violation of 21 U.S.C. § 848(e). Counts Three and Four charged defendants Maldonado and Flores with the murder of Leonard Overman on or about October 9, 1994, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 924(j). The Indictment alleges that Maldonado was the shooter hired to

3

kill Overman.  Counts Five through Eight of the Indictment charged defendants Maldonado, Flores, and Cedeño with the non-fatal shooting of Genaro Rodriguez ("Rodriguez") and shooting death of Carmen Diaz ("Diaz") on or about December 13, 1994, in violation of 18 U.S.C. §§ 924(j), 1958, and 2, and 21 U.S.C. § 848(e).  Once again Maldonado is alleged to be the hired shooter of both Rodriguez and Diaz, and he and his co-defendants are alleged to have planned and carried out the shooting by communicating "through a facility of interstate commerce."  The Indictment refers to "others known and unknown" who participated in the alleged conspiracy.

### A.  **Guerrero's Arrest and Search of His House**

On April 15, 2009, in the early morning, federal agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") ( the "ATF agents") including Special Agent Charles J. Mulham ("Mulham") came to Guerrero's home in Miami, Florida, with a warrant for his arrest.  Because, inter alia, Guerrero had been charged with being the shooter in two violent intentional homicides, the agents decided to enter quickly by forcing open the front door. At a certain point, Guerrero and his wife, MaryAnne

4

Guerrero ("Mrs. Guerrero") (collectively, "the Guerreros"),
came to the door to open it.  Parties dispute whether or
not the Guerreros succeeded in opening the door, or merely
attempted to open it while the agents were prying it open.
See Guerrero Aff. ¶ 3, Mulham Aff. ¶ 4 & n.1.  The ATF
agents removed Guerrero and his wife from the doorway,
placed them on the ground outside their home, and
handcuffed them.

The ATF agents entered the house and conducted a
security sweep, searching for other occupants of the house
and finding a young child of undetermined age, MaryAnne
Guerrero's twelve-year old brother, the Guerrero's sixteen-
year old son, Antonio, Jr., their thirteen year-old son,
Ramon, and Mrs. Guerrero's sixty-one year old mother.
Guerrero, Mrs. Guerrero, Antonio, Jr., and Ramon were
placed in handcuffs (the latter after he became
disruptive).  The parties dispute whether or not Mrs.
Guerrero's mother and the younger children were also
handcuffed.  See Guerrero Aff. ¶ 3, Mulham Aff. ¶ ¶ 5, 8.
In the course of the security sweep, Special Agent Gerry
Area saw a large photograph hanging on a wall on the second
floor that depicted Guerrero with suspected members of a
drug crew that had been active in the 1990s in the Bronx, a

fact that he later reported to Mulham.  The agents who had performed the security sweep left the premises soon after it had been completed and the occupants were secured. Mulham and Detective Clohessy entered the house and read Guerrero standard <u>Miranda</u> warnings from a preprinted card.

Guerrero was brought into the first-floor bedroom where Mulham advised him of the charges against him. Mulham then told Guerrero that he intended to obtain a warrant to search the house for photographs of Guerrero and other alleged members the drug crew.  Mulham had spoken with Assistant U.S. Attorneys in Miami and in the Southern District of New York who had told him that, based on the photograph hanging on the wall, and other information that he provided to them, the warrant would issue very soon.

The agents then asked Guerrero if he would consent to a search of the house.  Before he could respond, Mrs. Guerrero, who owns the house jointly with Guerrero, was brought into the bedroom so that she could participate in the discussion.  According to the Government, Guerrero expressed reluctance to consent because he was afraid the agents would "destroy" his home during the search, but Mulham responded that a consent search would be limited

only to photographs whereas a search pursuant to a warrant
would be broader. Mulham Aff. ¶ 14.  According to Guerrero,
agents threatened to "destroy" his home during the search
if they had to go through the process of getting a warrant.
See Guerrero Aff. ¶ 4, Mulham Aff. ¶¶ 13, 19, 20.  Guerrero
claims that at some point "agents threatened to arrest my
thirteen-year old son."  Guerrero Aff. ¶ 3.  While Mulham
concedes that these threats were made on account of Ramon's
disruptive behavior, he maintains that they were not in any
way linked to evincing consent from the Guerreros to search
the house. Mulham Aff. ¶ 18.

The Guerreros agreed to let the agents look at two
family albums which MaryAnne Guerrero had recently
compiled.  The Guerreros signed a consent form which
limited the search only to "photos that depict members of
the organization currently under investigation.  The search
will be for the photos alone and will not extend to any
other item(s) in the residence."  Gov't's Mem. of Law in
Opp'n to Def's Mot. to Suppress. Ex. B.  The agents seized
a number of photographs from photo albums along with the
photograph that had been hanging in the hallway.

B.  **Maldonado's Post-Arrest Statements and Discovery**

7

On or about April 21, 2009, Maldonado was arrested and
presented in federal court on the charges set forth in the
Indictment.  According to a June 18, 2009 discovery letter,
Maldonado made an "incriminating statement" while being
transported from the New York State detention facility to
his arraignment in the Southern District of New York.
Mulham submitted the following report, in relevant part:

> [A]t approximately 0950 hours, MALDONADO was
> arrested . . . was advised of his rights by Det.
> Clohessy and was then removed from the [New York
> State prison] facility to be driven back to the
> Southern District of New York (SDNY) for his
> arraignment . . . [w]hile in [sic] route to the
> Southern District, MALDONADO made incriminating
> statements, specifically—that he knows "BB" (Elyn
> REYNOSO—another defendant in this case) and that
> they had been friends since they were young boys.
> Moreover, that REYNOSO had testified against
> MALDONADO in his 1995 murder trial.  Lastly,
> MALDONADO states that he would fight REYNOSO if
> he were to see him . . . .

Buchwald Decl. Exh. C.

Since the time of Maldonado's arrest, the Government
has produced discovery to the Defendants including autopsy
and ballistics reports, crime scene photographs,
transcripts, prison phone and visitation records, evidence
vouchers documenting items seized at the crimes scenes,
photos of some of the Defendants with their alleged co-

conspirators taken around the time of the charged murders, and witness statements.

On October 15, 2009, at the oral argument on Maldonado's motions, the Court granted Maldonado's counsel's request that he be able to look at unredacted prison visitation logs in the Government's offices, and share it only with attorneys at his firm.  The Court extended the ruling to the counsels of the co-defendants.

## II.  DISCUSSION

### A.  Entry Into Guerrero's Home After His Arrest Was Legal

Guerrero claims that the agents' entry into his home after his arrest outside his home was illegal. He concedes that had the agents arrested him inside his home "they would have been entitled to conduct a security sweep of the premises," given that they had an arrest warrant.  But Guerrero argues that when he and his wife were "forcibly removed from the premises . . . the warrant, having been executed, lost its vitality as the key to the front door." Def's Mem. of Law at 3.

9

Guerrero incorrectly relies on his physical location during the arrest as being the dispositive issue in determining whether the security sweep was valid.  The Second Circuit Court of Appeals addressed exactly this situation in United States v. Oguns, 921 F.2d 442 (2d Cir. 1990), and ruled that security sweeps incident to arrests outside the home are permissible when "the arresting officers had (1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public."  Oguns, 921 F.2d at 446 (internal quotation marks omitted).  It was reasonable for the agents to believe that there were others in the house.  Antonio, Jr. was standing near the first floor stairwell, Mulham Aff. ¶ 4, indicating that at least one, and possibly more individuals resided inside the home. Additionally, the Guerreros lived in a multi-story house that could accommodate a large family.  See Oguns, 921 F.2d at 446 (where defendants were arrested outside their two-family house, it was reasonable to believe there were others inside).  Further, the noise that the ATF agents made in trying to break down the door, made it reasonable for them to believe that the people inside had been alerted

to the arrest and might be destroying evidence.  Therefore, the security sweep of the house was legal.

## B. A Hearing Is Granted To Determine Voluntariness of Consent To Search

In order for a suppression claim to warrant an evidentiary hearing, a defendant must allege facts that, if proved, would require the granting of relief. See United States v. Warren, 453 F.2d 738, 743 (2d Cir. 1972); United States v. Culotta, 413 F.2d 1343, 1345-46 (2d Cir. 1969); United States v. Dames, 380 F. Supp. 2d 270, 276 (S.D.N.Y. 2005).  To meet this burden, a defendant must present his claim through an affidavit of an individual with personal knowledge of the relevant facts. See United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967), United States v. Jailall, 00 CR. 069, 2000 WL 1368055, at *8 (S.D.N.Y. September 20, 2000.  On the basis of such an affidavit, the defendant must show "that disputed issues of material fact exist before an evidentiary hearing is required." United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (quoting United States v. Castellano, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985)).

Guerrero's affidavit alleges sufficient disputed facts to warrant an evidentiary hearing as to whether the Guerreros' consent was voluntarily given.  Whereas Mulham's affidavit alleges that only Guerrero, Mrs. Guerrero, their sixteen-year old son and their thirteen year-old son were handcuffed, Guerrero's affidavit claims that his twelve-year old brother-in-law, his mother-in-law, and his third child were also handcuffed.  Guerrero also alleges that threats were made to arrest Ramon in an attempt to coerce Guerrero's consent to search the house, whereas the Government maintains that those threats were made because of Ramon's disruptive behavior and were not related to efforts to attain the Guerreros' consent.  Additionally, Guerrero claims that agents threatened that, if he did not consent to allow them to search for photographs, they would get a warrant and "destroy the house in the search."  The facts, if proven, would tend to establish that the Guerreros' consent was not voluntary.  Therefore, in order to determine "the totality of all the circumstances" by which voluntary consent is determined, Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), these factual disputes must be resolved.  Accordingly an evidentiary hearing is granted on the issues of who was handcuffed and whether threats to destroy the house and to arrest Ramon

12

were made in connection with the consent.  The parties will confer on an appropriate date for the hearing and advise the Court.

### C. **Maldonado's Motion to Sever Counts One and Two From Counts Three Through Eight of the Indictment Is Denied**

Maldonado argues that because only Guerrero is charged in Counts One and Two, and because joinder of those counts to the other counts in the Indictment will prejudice Maldonado and the remaining Defendants, those counts should be severed from the Indictment.

Rule 8(b), Fed. R. Crim. P., states that defendants may be charged together in an indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transaction, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count."  Maldonado maintains that because the Defendants are charged with separate murders, the Indictment does not allege that they participated in the same act or series of acts.  Def's. Mem. of Law in Support of Pretrial Mots. at 2.

Although the counts refer to separate shootings, they are said to stem from a single narcotics conspiracy and "relate to the elimination of the drug rivals of that same narcotics drug conspiracy in the Fall of 1994,", and were "planned at the same time and occurred within approximately one month of each other."  Gov't's Mem. of Law in Opp'n to Def's Pretrial Mots. at 9.  The Government alleges that "the same general group of individuals was involved in each of the murders and the facts will be established at trial though the same general group of witnesses."  Id. Moreover, the evidence that the Government will put forward to prove the murders with which Maldonado is not charged will overlap with the evidence relating to the murders with which he is charged.  Id.  Thus, each Defendant is accused of participating in acts that are "'unified by some substantial identity of facts or participants and a common plan,'" a scenario under which the Second Circuit Court has held joinder of defendants "proper," see United States v. Freyer, 333 F.3d 110, 114 (2d Cir. 2003)(quoting Attenasio, 870 F.2d at 815), and the evidence of the alleged murders will be admissible to prove the conspiracies referenced in the Indictment, regardless of whether the Defendants' cases are severed.  See United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) ("Evidence at the joint trial of alleged co-

conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.")

Maldonado also argues that joinder of Counts One and Two prejudices the other Defendants because it "requires the jury to hear the details of two violent murders that have no connection to [those Defendants.]"  He claims that joining these counts to the others will cause the jurors' to allow their perception of Guerrero's alleged crimes to "'spillover'" onto their assessment of the other Defendants.  Def's. Mem. of Law in Support of Pretrial Mots. at 3.

Rule 14, Fed. R. Crim. P., states that "if the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." There is, however, a strong preference for joint trials in the Second Circuit, where "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."  Rosa, 11 F.3d at 341.  Joint

trials promote efficiency and conserve prosecutorial

resources by allowing prosecutors to avoid

> presenting the same evidence again and again,
> requiring victims and witnesses to repeat the
> inconvenience (and sometimes trauma) of
> testifying, and randomly favoring the last-tried
> defendants who have the advantage of knowing the
> prosecutions case beforehand.   Joint trials
> generally serve the interests of justice by
> avoiding inconsistent verdicts and enabling more
> accurate assessment of relative culpability—
> advantages which sometimes operate to the
> defendant's benefit.   Even apart from these
> tactical considerations, joint trials generally
> serve the interests of justice by avoiding the
> scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987) (footnote

omitted).  Thus, even where joint trials invite some

prejudice to defendants, "[t]he risks of prejudice

attendant in a joint trial are presumptively outweighed by

the conservation of time, money, and scarce judicial

resources that a joint trial permits."  United States v.

Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).


    In order to demonstrate that severance is necessary,

it is not enough for a defendant to show that he "may have

a better chance of acquittal in [a] separate trial."

Zafiro v. United States, 506 U.S. 534, 540 (1993).

Instead, "a district court should grant a severance under

Rule 14 only if there is a serious risk that a joint trial

would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro at 539; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."); United States v. Casamento, 887 F.2d 1141, 1150 ("If the denial of the motion [to sever] causes some prejudice, but less than substantial prejudice, [the Court of Appeals is] not apt to reverse [the district court's decision] since, by and large, joinder promotes judicial efficiency.")  Joinder may still be appropriate when evidence of wrongdoing is admissible only against one of the defendants; where defendants have markedly different levels of culpability; or where a co-defendant's statement technically admissible only against a co-defendant was also probative of the defendant's guilt.  Zafiro, 506 U.S. at 539.  Even in instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  Id. (citing Richardson, 481 U.S. at 211).

The presumption in favor of joint trials is "particularly strong where, as here the defendants are alleged to have participated in a common plan or scheme." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are both charged in the same conspiracy." United States v. Pirro, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999); see also In conspiracy cases, especially, any claim of "prejudicial spillover" does not justify severance because the evidence would be admissible at a separate trial of the moving defendant.  As the Second Circuit has recognized,

> the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against he moving defendant tried separately.  Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.

Rosa, 11 F.3d at 341 (citations omitted).  Rather, undue "prejudice" may occur "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper.  This is an unlikely occurrence when all the defendants are charged under the same conspiracy count." Salameh, 152 F.3d at 115 (citation omitted).

In addition, the concern that the jury will not be able to segregate the evidence between the defendants implicated in different violent acts would be speculative. Any spillover prejudice that may occur can be corrected by the Court's instruction that the jury consider the guilt of each Defendant individually—-an instruction that jurors are presumed to be able to follow.  United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984); see also United States v. Lasanta, 978 F.2d 1300, 1307 (2d Cir. 1992) ("[t]he district court countered any possible spillover with specific instructions to the jury . . . that the jury should consider the evidence separately against each defendant"); United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993).

The weight of the law and the majority of policy concerns therefore favor leaving the Indictment intact. Accordingly, Maldonado's motion for severance is denied.

## II.  **MALDONADO'S DEMAND FOR A BILL OF PARTICULARS IS DENIED**

Maldonado has moved pursuant to Rule 7(f), Fed. R. Crim. P., for production of a bill of particulars by the

Government identifying "known" co-conspirators in the underlying drug conspiracy and specifying the alleged interstate communications in Counts Five and Six of the Indictment.

Under Rule 7(f), a district court "may direct the filing of a bill of particulars." Fed. R. Crim. P. 7(f). Rule 7(f), as the Court of Appeals for our Circuit has explained, "permits the defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); see also United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990). The decision to grant or deny a defendant's request for a bill of particulars rests in the sound discretion of the trial court. See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998); United States v. Perez, 940 F.Supp. 540, 550 (S.D.N.Y. 1996).

To obtain a bill of particulars, the defendant must show that the charges of the indictment are so general that they do not advise him of the specific acts of which he is accused.  See Torres, 901 F.2d at 234; United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994).  The standard applied to the information sought is not whether it is helpful to the defense but whether it is necessary to apprise the defendant of the charges against him. See Henry, 861 F. Supp. at 1197; United States v. Love, 859 F. Supp. 725, 738 (S.D.N.Y.), aff'd sub nom. United States v. Roberts, 41 F.3d 1501 (2d Cir. 1994).

An order directing the filing of a bill of particulars will not be issued simply to "force the Government to particularize all of its evidence." Henry, 861 F. Supp. at 1197 (quoting United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991), cert. denied, 502 U.S. 1037 (1992)) (internal quotation marks omitted).  Nor will a defendant be permitted to use a request for a bill of particulars to compel the government to disclose the manner in which it will prove the charges or preview the government's evidence or legal theory.  See United States v. Ballesteros Gutierrez, 181 F. Supp. 2d 350, 356 (S.D.N.Y. 2002); Perez, 940 F. Supp. at 550; United States v. Facciolo, 753 F.

Supp. 449, 451 (S.D.N.Y.1990).  Simply put, a defendant may
not employ a bill of particulars as a general investigative
tool.  See Ballesteros Gutierrez, 181 F. Supp.2d at 356.
Specifically, "demands for particular information with
respect to where, when, and with whom the Government will
charge the defendant with conspiring are routinely denied."
United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y.
2001) (emphasis added) (collecting cases); see, e.g.,
Torres, 901 F.2d at 233-34 (demands for whens, wheres and
by whoms charged conspiracy are improper attempts at
general pretrial discovery

     The identity of co-conspirators in particular has been
held to be outside the function of a bill of particulars in
cases with similar facts to the instant case.  See United
States v. Robertson, No. 07-CR-944, 2008 WL 220283, at *1
(S.D.N.Y. Jan. 23, 2008)(denying motion for a bill of
particulars in a narcotics conspiracy case where there was
"no suggestion that either the scope of the alleged
conspiratorial conduct or the volume of discovery material
necessitates the further identification of persons, places
or events to enable [the] Defendant properly to prepare for
trial"); United States v. Joseph, No. 02-CR-1589, 2003 WL
22019427, at *2 (S.D.N.Y. Aug. 26, 2003)(denying request

where "the number of defendants [in this case] is small,
the duration of the alleged acts was not long and the
number of unnamed co-conspirators or parties allegedly
assisting in the wrongdoing does not appear to be so large
such that there is not much likelihood that Defendants
would be surprised by the identity of these persons")
(internal quotation marks omitted); see also Torres, 901
F.2d at 234 (affirming denial of request for bill of
particulars seeking identity of co-conspirators, "known and
unknown," among other particulars); United States v. Mason,
No.06-CR-80, 2007 WL 541653 (S.D.N.Y. Feb. 16, 2007), at
*4-5 (denying motion for particulars identifying all co-
conspirators in connection with indictment charging ten
defendants in seven-year narcotics conspiracy); United
States v. Ma, No. 03-CR.-734, 2006 WL 708559, at *14
(S.D.N.Y. Mar. 21, 2006) ("Courts also deny bills of
particulars seeking the names and identities of unindicted
co-conspirators where sufficient discovery has been
provided."); United States v. Mahaffy, 446 F. Supp 2d 115,
120 (S.D.N.Y. Aug. 31, 2006) ("Considering the specificity
of the allegations in the Indictment and the discovery that
the Government has provided . . . Defendants have received
adequate information on which to prepare their defenses"
and denying request for particulars identifying unindicted

co-conspirators); United States v. Chalmers, 410 F. Supp.
2d 278, 286 (S.D.N.Y. Jan. 25, 2006) (where Government
produced extensive discovery, identification of co-
conspirators was not necessary for the preparation of the
defense); United States v. Minaya, 395 F. Supp. 2d 28, 37
(S.D.N.Y. 2005) (denying request for identification of
unindicted co-conspirators); United States v. Rittweger,
259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) (denying request
for identification of unindicted co-conspirators); United
States v. Viertel, No. 01-CR-571, 2002 WL 1560805, at *12
(S.D.N.Y. July 15, 2002) (defendant not entitled to
identity of co-conspirators and witnesses).

Moreover, even where requests for identity of co-
conspirators have been granted, courts have considered,
among other factors, whether the defense articulated a
particular need for the information sought and whether the
nature of the charges were violent ones that suggest
disclosure of unindicted co-conspirators could lead to the
intimidation of witnesses, including informants, and hinder
an ongoing Government investigation.  See United States v.
Avendano, No. 02-CR-1059, 2003 WL 22454664, at *8-9
(S.D.N.Y. Oct. 29, 2003) (citing United States v. Nachamie,
91 F. Supp. 22d 565, 572 (S.D.N.Y. 2000), aff'd, 211 Fed.

Appx. 76 (2d Cir. 2007)(noting there had been no violence alleged in the case and that nothing in the record indicated that revealing the alleged co-conspirators' identities would endanger them); see also United States v. Robertson, No. 07-CR-944, 2008 WL 220283, at *2 (S.D.N.Y. Jan. 23, 2008) (denying motion and noting Government's proffer that "disclosure of the names of unindicted co-conspirators and potential informants could jeopardize the Government's investigation, as well as endanger any potential witnesses to the criminal activity").  The "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" United States v. Shamsideen, No. 03-CR-1313, 2004 WL 1179305, at *11 (S.D.N.Y 2004) (citing Rovario v. United States, 353 U.S. 53, 59 (1957); United States v. Jackson, 345 F.3d 59, 69 (2d Cir. 2003)).  An exception to this general rule exists only where "the defendant shows that discovery of the witness's identity is material to the defense." United States v. Robles, No. 04-CR-1036, 2005 WL 957338, at *1 (S.D.N.Y. 2005) (citing United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988)); see also United States v. Russotti, 746 F.2d 945, 949 (2d Cir. 1984) ("[A]n

informant's identity need not be disclosed unless 'essential to the defense.'") (quoting Scher v. United States, 305 U.S. 251, 254 (1938)).

The Government alleges that some of the "known" co-conspirators may be Government informants whose identities must be protected. Under such circumstances, the defendant bears the burden of demonstrating that he is entitled to the "extraordinary remedy" of disclosure of Government informants. United States v. Muyet, 945 F. Supp. 586, 602 (S.D.N.Y. 1996). In order to carry this burden he must make an affirmative showing that "'the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause,'" Saa, 859 F.2d at 1073 (quoting Rovario, 353 U.S. at 77), and that, accordingly the need for disclosure of an informant's identity outweighs the Government's interest in anonymity, see Shamsideen, 2004 WL 1179305, at *11 (citing Fields, 113 F.3d at 324); United States v. Jimenez, 789 F.2d 167, 170 (2d Cir. 1986) (disclosure not warranted where defendant produced no evidence that informant's testimony "would have been of even marginal value to the defendant's case"). Separate authority holds that the Government is not obligated to

disclose its witnesses during pretrial discovery: "Fed. R. Crim. P. 16 does not require the Government to furnish the names and addresses of its witnesses in general." United States v. Bejasa, 904. F.2d 137, 139 (2d Cir. 1990); see also United States v. Green, 2004 WL 2985361, at *4. Nor does any other rule or statute.

The Indictment charges Maldonado with two specific shootings and specifies the date on which those shootings occurred, the location, the type of weapon alleged to have been used, and the specific role that Maldonado is alleged to have played in connection with each shooting. The discovery provides additional details about how the murders were conducted, including autopsy and crime scene photographs, evidence vouchers documenting items seized at the crimes scenes, ballistics reports, and other police documents. The Defendants have further been provided with witness statements, prison phone and visitation records, and photos of some of the Defendants with their co-conspirators taken around the time of the charged murders.

The foregoing materials sufficiently apprise the defendant of the nature of the charges against him, allow him to prepare for trial, and ensure that he will not be

27

prosecuted twice for the same crimes.  The more specific
information the defendant seeks—-namely, the "with whoms"
regarding the charged shootings and murders and the
Government's specific anticipated proof at trial of
interstate communications—-is the type "routinely denied by
the Second Circuit"  because, although potentially helpful,
it is not "necessary" to the defense.  Robertson, 2008 WL
220283, at *1 (internal quotation marks omitted).  The
Indictment charges discrete events, mostly on specific
dates.  The nature of the crimes is such that the defendant
can be expected to have met, and thus already know the
identities of his co-conspirators.  This is not an
"intricate fraud conspiracy" where a defendant may need the
names of his co-conspirators, in "order to piece together
the nature of the charges against [him]."  United States v.
Solomonyan, 451. F. Supp. 2d 626, 642 (S.D.N.Y. 2006)
(denying request where defendant was charged in an arms
tracking conspiracy).

Additionally, the nature of the charges in this case
counsels against granting the relief sought because it
would identify potential cooperating witnesses, exposing
them and their families to intimidation or retaliation, and

28

potentially compromising the Government's ongoing
investigation of as-yet unidentified co-conspirators.

Much of the case law cited by Maldonado in which
district courts ordered the disclosure of unindicted co-
conspirators can be distinguished from the facts of this
case.  In some of those cases, the Government volunteered
the names of the co-conspirators.  See, e.g., United States
v. Faillia, No. 93-CR-00294, 1993 WL 547419, at *7
(E.D.N.Y. Dec. 21, 1993); United States v. Moazzam, No. 92-
CR-152, 1993 WL 36175, at *1 (S.D.N.Y. Feb. 5, 1993);
United States v. Lonzo, 793 F. Supp. 57, 60 (N.D.N.Y. June
10, 1992).  In other cases the charges referred to complex
and long-term conspiracies that often involved fraud,
unlike the one at issue here.  See, e.g., United States v.
Feldman, 731 F. Supp. 1189, 1191 (S.D.N.Y. 1990) (multi-
year tax evasion conspiracy); United States v. Chovanec,
467 F. Supp. 41, 43 (S.D.N.Y. 1979) (identifying at least
27 counts in racketeering indictment); United States v.
Kole, 442 F. Supp. 852, 854 (S.D.N.Y. 1977) (five-year
conspiracy involving multiple bribes); United States v.
Pilnick, 267 F. Supp. 791, 794 (S.D.N.Y. 1967) (57-count
indictment).  Although some of the cases involve narcotics
charges, most did not involve charges of violence or any

suggestion that disclosure would reveal the identities of
government witnesses, or put those witnesses at risk.  See
United States v. Columbo, No. 04-CR-273, 2006 WL 2012511,
at *6 n.18 (S.D.N.Y. July 18, 2006) ("[R]equests for bills
of particulars have rarely been granted in cases involving
defendants charged with violent offenses."); United States
v. Santiago, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001) ("[T]he
identities of unindicted co-conspirators have been
disclosed primarily in cases in which violence was not
alleged.")

In light of the foregoing, the defense's motion for a
bill of particulars, including the Government's anticipated
proof at trial related to interstate communication, is
denied.

### III.   MALDONADO'S MOTION TO EXCLUDE HIS POST-ARREST STATEMENT IS DENIED

Maldonado moves to exclude his post-arrest statements
made to officers transporting him to his arraignment on the
grounds that they are misleading and prejudicial.
Maldonado claims that Mulham's reference to Elyn Reynoso as
"another defendant in this case" is untrue and will
therefore mislead the jury.  Further, he claims that
Mulham's statement confuses two individuals known as "BB,"

30

and that the "BB" whom Maldonado knows is named Luis
Inglesias, not Elyn Reynoso.  Maldonado also argues that
the Mulham's report's reference to his "1995 murder trial"
is prejudicial, conveying to the jury an image of him as a
convicted criminal (along with the fact that Maldonado
claimed he would "fight REYNOSO") and is irrelevant to this
case.  Since any probative value of the statements is
outweighed by its danger of unfair prejudice, Maldonado
argues, the statement should be excluded from evidence.

Maldonado's arguments are unfounded and premature.  If
there has been confusion between Elyn Reynoso and Luis
Inglesias the Government has said it will not present such
statements at trial.  Gov't's Mem. of Law in Opp'n to Def's
Pretrial Mots. at 29.  To the extent that the Government
seeks to admit evidence of Maldonado's prior murder trial,
it will be confined by the limits of Fed. R. Evid. 404(b),
which governs which evidence of other crimes, wrongs or
acts may be admitted against a defendant or a witness.  Any
ruling on that issue at this time would be premature.

**IV.  DEFENDANT'S REQUEST FOR CO-CONSPIRATOR AND WITNESS
PHOTOGRAPHS IS DENIED**

31

Maldonado requests that the Government disclose approximately twenty photographs which the Government claims contain images of the Defendants in this case, as well as other persons who may be witnesses and co-conspirators in the case.  The Government has emphasized that there is an on-going investigation relating to the people in the photos and that their disclosure to the Defendants might endanger potential witnesses or other unindicted co-conspirators.  The Government has allowed Maldonado's counsel to view the photographs in their offices but has not provided the defense with copies of the photos that they would be able show to potential witnesses in the course of their investigations.  Maldonado argues that these items are "material" to preparing his defense because "the photographs will enable [them] to identify persons who may be referred to" at trial, Def's Mem. of Law in Support of Pretrial Mots. at 9, and that they should therefore be disclosed pursuant to Fed. R. Crim. P. 16(a)(1)(E).

The Government has no obligation to produce copies of photographs of co-conspirators and witnesses, particularly where that production would place those individuals at risk, or where the photographs are being used as part of an

on-going investigation, as is the case here, see <u>United States v. Robertson</u>, No. 07-CR-944, 2008 WL 220283, at *2, (S.D.N.Y. Jan. 23, 2008)  The Government has invited Maldonado's counsel to examine the photographs in their offices, specifically to allow them to raise any objections to the Government's identification practices.  There are no further grounds on which Maldonado may seek the production of the photographs at this stage.  His request is therefore denied.

It is so ordered.

**New York, NY**
**November** ____ **, 2009**

ROBERT W. SWEET
U.S.D.J.