UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

ANTONIO GUERRERO,

               Defendant.

------------------------------------X

09 Cr. 339-01

SENTENCING OPINION

**Sweet, D.J.**

       On June 4, 2010, Antonio Guerrero, ("Guerrero" or the "Defendant") was found guilty of two counts of intentional murder while engaged in a drug trafficking crime, in violation of 21 U.S.C. § 848(e)(1)(A).  For the reasons set forth below, Guerrero will be sentenced to 25 years' imprisonment and five years' supervised release on each count, with the sentences to run concurrently.  Guerrero is also required to pay a special assessment of $200.


**Prior Proceedings**

       On April 7, 2009, Indictment 09-CR-339 (RWS) was filed in the Southern District of New York.  This case arises out of

1

the prosecution of members of the Solid Gold drug organization for the September 3, 1994 murders of Livino Ortega ("Ortega") and Fernando Garrido ("Garrido"); the October 9, 1994 murder of Leonard Overman ("Overman") and non-fatal shooting of Alvino Wade ("Wade"); and the December 13, 1994 murder of Carmen Diaz ("Diaz") and non-fatal shooting of Genero Rodriguez ("Rodriguez").

Count 1 charges that on September 3, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Guerrero, and others, intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Ortega in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 2 charges that on September 3, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Guerrero, and others intentionally

2

and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Garrido, in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 3 charges that on October 9, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Edwin Maldonado ("Maldonado"), Omar Flores ("Omar"), and others intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Overman, in the vicinity of Crotona Park and Southern Boulevard, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 4 charges that on October 9, 1994, in the Southern District of New York, Maldonado, Omar, and others, during and in relation to a conspiracy to distribute and possess with intent to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," did use and carry a firearm, and, in furtherance of such crime, Omar provided Maldonado with

3

a handgun, which Maldonado used to shoot and kill Overman, in the vicinity of Crotona Park and Southern Boulevard, Bronx, New York, in violation of 18 U.S.C. § 924(j).

Count 5 charges that from the fall of 1994 up to and including December 13, 1994, in the Southern District of New York and elsewhere, Omar and Johnny Cedeño ("Cedeño") agreed with others to pay Maldonado to kill Rodriguez in exchange for currency and other things of pecuniary value, and in the course thereof did communicate through a facility of interstate commerce, which resulted in the non-fatal shooting of Rodriguez and the shooting death of Diaz in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 1958.

Count 6 charges that from the fall of 1994 up to and including December 13, 1994, in the Southern District of New York, Omar and Cedeño paid Maldonado to kill Rodriguez and in the course thereof did communicate through a facility of interstate commerce, after which Maldonado shot Rodriguez and shot and killed Diaz, in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 1958.

Count 7 charges that on December 13, 1994, in the

4

Southern District of New York, while engaged in a conspiracy to distribute and to possess with intent to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Maldonado, Omar, Cedeño, and others intentionally and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Diaz, in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 8 charges that on December 13, 1994, in the Southern District of New York, Maldonado and others during and in relation to the conspiracy to commit murder-for-hire charged in Count 6 of the Indictment and the intentional killing of Diaz charged in Count 7 of the Indictment, and during and in relation to a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," in the Bronx, New York, did use a semi-automatic handgun to shoot and kill Diaz in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 18 U.S.C. § 924(j).

Sentencing is scheduled for February 13, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines.    Thus, the sentence to be imposed here is the result of a consideration of:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed —

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for —

> > (A)  the applicable category of offense committed
> >      by the applicable category of defendant as
> >      set forth in the guidelines . . .;
>
> (5)  any pertinent policy statement . . . [issued
>      by the Sentencing Commission];
>
> (6)  the need to avoid unwarranted sentence
>      disparities among defendants with similar
>      records who have been found guilty of
>      similar conduct; and
>
> (7)  the need to provide restitution to any victims of
>      the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.  See Crosby, 397 F.3d at 114-15.


**The Defendant**


The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Guerrero's personal and family history.


**The Offense Conduct**


The following description draws from the PSR.  The specific facts of the underlying conduct are adopted as set

forth in that report.

**A. Background**

In the early to mid 1990s, Guerrero and Maldonado were members of a crew that ran a retail crack cocaine spot at 173rd Street and Boston Road in the Bronx. The spot was "owned" by Ramon Flores ("Ramon") and his identical twin brothers, Omar and Leonardo Flores ("Leonardo"). The crew called itself "Oro Solido," or "Solid Gold," after a song that was then popular in the Dominican community, and which was also a reference to the gold caps the crew used on their crack vials. Solid Gold ran the Boston Road spot from roughly 1992 to 1997.

At its peak, the Boston Road spot sold approximately a kilogram of crack cocaine a week. Solid Gold employed numerous persons at the spot, including mangers who ran the day to day drug business, stash house workers who bagged up the crack in individual packets and bundles so it could be sold to Sold Gold's customers, and "pitchers," who conducted the actual sales of crack cocaine at the drug spot. Guerrero worked steadily for approximately two years as a manger for Solid Gold. Maldonado worked for Solid Gold for a shorter period of time as a pitcher

8

and sometimes manager.

During the course of its existence, Solid Gold maintained a number of stash houses which members used to store crack cocaine and numerous firearms. Guerrero's apartment, which was in a building directly across the street from the spot used to conduct the drug sales, was used principally to store firearms. The firearms were kept in a closet in Guerrero's apartment and were accessible to members of Solid Gold. The firearms were used by various members of Solid Gold – including Guerrero, Maldonado, Omar and Leonardo, to intimidate, threaten and murder Solid Gold's drug rivals. Members and associates of Solid Gold committed five murders and numerous shootings in 1994 to protect its lucrative drug turf at 173rd Street and Boston Road.

## B. The Murder of Jimmy Feliz on Boston Road and 173rd Street

On January 11, 1994, Jimmy Feliz, a/k/a "Jimmy Felix," a/k/a "Jimmy Arias," was gunned down in front of 1685 Boston Road in the Bronx. Feliz had recently been released from prison and had been attempting to regain control of the crack spot he had previously run with Ramon at 173rd Street and Boston Road,

which was now being run by Solid Gold.  Ramon and other members
of Solid Gold, including Leonardo and Guerrero, agreed that
Feliz should be killed so they could continue to control the
spot.  Ramon, Leonardo and another member of Solid Gold arranged
for a gunman in the Bronx to commit the murder.  They agreed to
pay the hired assassin and provided him with a .357 firearm to
commit the murder.  Feliz was shot multiple times near a bodega
on 173rd Street and Boston Road.  After the murder, Solid Gold
owned the drug spot exclusively.

### C. The Murders of Ortega and Garrido on Minford Place

On September 3, 1994, Ortega, a crack dealer, and his
friend, Garrido, were shot as they stood near a gas station on
Minford Place and 173rd Street in the Bronx, within 100 feet of
Solid Gold's drug spot.  Both Ortega and Garrido died as a
result of their gunshot wounds.

The Solid Gold crew had been having problems with
Ortega, who was selling crack cocaine in close proximity to the
Solid Gold spot and who was directly competing with Solid Gold
for customers.  As a result, members of the Solid Gold crew had
several confrontations with Ortega.  Solid Gold was also having

problems with Overman, a/k/a "Boo," who had owned the Solid Gold
drug spot before Solid Gold's predecessor, Jimmy Feliz.  Since
being released from jail, Overman had made it clear that he
wanted the drug spot back for himself and his partner, Wade.
Things became so heated that, at one point, Ramon, Leonardo and
Guerrero armed themselves with guns and prepared to shoot at
Overman and Wade from the rooftop of 1669 Boston Road.
Guerrero, who was on duty as a manger that day, left to attend
to the spot shortly before the Flores brothers shot at Wade as
he walked below in the street.  The attempt to shoot Wade was
unsuccessful as he managed to evade the gunfire and get away.

On the day Ortega and Garrido were killed, members of
Solid Gold, including Miguel Padilla ("Padilla"), Ramon,
Leonardo and Guerrero sought out Overman to kill him.  Their
plan was prompted when Overman assaulted one of the Solid Gold
workers at the drug spot.  When the crew was unable to find
Overman that day, however, they returned to Boston Road.  Once
there, the crew decided that, since they were armed and
prepared, they might as well take the opportunity to kill
Ortega.

In preparation for the anticipated shooting of

11

Overman, Guerrero had armed himself earlier that day with a 9 millimeter firearm, which he had retrieved from his apartment on Boston Road.  Guerrero, his face obscured by the hood of his sweatshirt, walked to the corner of 173rd Street and Minford Place and shot Ortega in the head at close range.  Guerrero then shot Garrido, who had been standing with Ortega, in the back. Guerrero then got into a white van that was waiting for him down the block.  Padilla, who was in the driver's seat, drove a few blocks away, where Padilla and Guerrero regrouped with Ramon and Leonardo, who were waiting there in Leonardo's burgundy car. Guerrero got in the burgundy car and announced that "I killed him."  Leonardo then drove away.  Ortega, who sustained three gunshot wounds, died on the spot.  Garrido, who sustained a single gunshot wound to the back, died some hours later at a hospital in the Bronx.

**D. The Murder of Overman and the Non-Fatal Shooting of Wade on Southern Boulevard**

A couple of weeks after the murders of Ortega and Garrido, the crew renewed its efforts to kill Overman and his partner, Wade.  Padilla recruited Maldonado to commit the murder.  On the morning of the murder, October 9, 1994, Ramon,

Padilla and Maldonado met at the apartment of Ramon's girlfriend, which was a short distance from the spot on Southern Boulevard where Overman regularly sold marijuana.  Maldonado was wearing a sweatshirt with a hood tied tightly around his face.  Maldonado had been given a .357 caliber revolver by members of Solid Gold.

After confirming that Overman was at his spot on Southern Boulevard, Maldonado, Padilla and Ramon left the apartment, and Maldonado got on a dirt bike and proceeded to Overman's drug spot.  Maldonado later described to the crew members how he murdered Overman and shot Wade.  According to Maldonado, the shot to Overman's head was so powerful that Overman's brains splattered in the street.  Overman was killed but Wade survived.

## E. The Trial and Conviction of Leonardo for the Murders of Ortega, Garrido and Overman

On October 12, 1994, Leonardo, a/k/a "Roberto Mercado," was arrested and ultimately charged with the murders of Ortega, Garrido and Overman.  Leonardo was convicted based almost exclusively on the testimony of three eyewitnesses to the

murders, all of whom testified that they saw Leonardo shoot the
victims at point blank range.  Ultimately, the two living
eyewitnesses recanted their testimony to federal agents who were
re-investigating the murders.

One of the living eyewitnesses, Omar Camacho, who was
sixteen years old at the time Ortega and Livino were murdered,
had initially claimed – and testified at the state trial – that
he saw the shooting, saw the shooter's face and knew who the
shooter was.  Camacho later admitted that he never saw a shooter
at all and had made up the version of events he later told to
the police at the urging of his stepfather.  The other living
eyewitnesses, Wade, later admitted that although he was in close
proximity to the shooter, he could not, in any event, make an
identification because the shooter's face was almost entirely
obscured by the hood of his sweatshirt.  Wade further admitted
that, although he never saw the shooter's face, he had no
problem implicating Leonardo because he knew that the shooter
was a member of Solid Gold and he did not particularly care
which crew member went to prison for the murder.

The third eyewitness, Ruben Negron, who has since
died, claimed that he was able to identify the shooter from his

14

parking lot, approximately 180 feet away from the shooting,
despite the fact that the shooter had a hood on his head.  In
addition, Negron's version of events changed substantially over
time.  For example, Negron failed to inform the police in his
initial statement that he knew the shooter, a claim he only made
after viewing an array containing a photograph of Leonardo, who
was known to him as a neighborhood thug.  Negron also failed to
tell the authorities, until days before the trial commenced a
year and a half later, that the shooter had on one occasion
threatened Negron with a gun and claimed that he killed people
for a living.

     Camacho, Negron and Wade all testified against
Leonardo at his trial in 1996.  There was no physical evidence
connecting Leonardo to the murders.  Leonardo was convicted of
three counts of murder, plus the non-fatal shooting of Wade.  He
was sentenced to 25 years to life on each murder count, the
sentences to run consecutively.

     As a result of evidence developed during the federal
investigation into the murders of Ortega, Livino and other
homicides committed by the Solid Gold crew, including the
recantations of Wade and Camacho, Leonardo, through counsel,

15

made a motion to set aside the New York State convictions based on newly-discovered evidence.  The motion was granted. Leonardo's prior convictions were vacated, and he pleaded guilty in state court to the September 3, 1994 murders of Ortega and Livino as an accessory.[1]  He was sentenced to 15 years to life in state prison.

### F. The Murder of Diaz and the Non-Fatal Shooting of Rodriguez on Bathgate Avenue

On December 13, 1994, Diaz, a young teenager, was shot and fatally wounded on Bathgate Avenue in the Bronx by Maldonado.  In September 1994, Cedeño, an associate of members of Solid Gold, pled guilty to criminal possession of a weapon in the second degree and was sentenced to three to six years of incarceration.  At the time of his arrest, Cedeño ran a retail crack cocaine spot in the vicinity of Bathgate Avenue and 178th Street in the Bronx and was involved in an ongoing turf war with Rodriguez.  Rodriguez sold heroin on the same block as Cedeño. At the time, Rodriguez lived at 1993 Bathgate Avenue with his

---

[1]    There was no evidence that Leonardo was involved, other than as a conspirator, in the murder of Overman.  In fact, Leonardo and other witnesses stated that he was in Queens when Overman was killed.

girlfriend and her daughter, Diaz.

Cedeño had a close relationship with members of Solid
Gold. In fact, Cedeño taught Ramon how to efficiently cook
crack cocaine. Moreover, prior to Cedeño's arrest, members of
Solid Gold provided Cedeño with the crack he sold on Bathgate
Avenue. After Cedeño's arrest, Solid Gold essentially ran
Cedeño's crack business at Bathgate Avenue for Cedeño. While
Cedeño was serving his sentence, he and members of Solid Gold
arranged for Rodriguez to be killed and for Solid Gold to
continue selling crack at Cedeño's spot. Maldonado was
recruited to do the murder because Cedeño admired the manner by
which he had killed Overman. Members of Solid Gold - Ramon,
Omar and Padilla - traveled to Orleans Prison in upstate New
York where they met with Cedeño to discuss and plan the murder
of Rodriguez and the arrangements to pay Maldonado to commit the
crime. The Flores brothers and Padilla also spoke frequently to
Cedeño by phone in the days leading up to the Bathgate
shootings, using the telephone of one of Cedeño's closest drug
associates.

On the day of the shootings, Maldonado proceeded on a
bicycle towards Bathgate Avenue. He approached Rodriguez, who

17

was standing in front of 1993 Bathgate Avenue.  Diaz was in the vestibule of the building.  Using a gun provided to him by Solid Gold, Maldonado shot both Rodriguez and Diaz numerous times.  On January 1, 1995, about two weeks after she was shot, Diaz died of the gunshot wounds she had sustained.  Rodriguez survived the shooting.

## The Relevant Statutory Provisions

For Counts 1 and 2, the mandatory minimum term of imprisonment is 20 years, and the maximum term of imprisonment is life imprisonment or death, pursuant to 21 U.S.C. § 848(e)(1)(A).

For each count, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1).  Such terms of supervised release run concurrently, pursuant to 18 U.S.C. § 3624(e).

For each count, the Defendant is not eligible for probation because the instant offenses are Class A felonies, pursuant to 18 U.S.C. § 3561(a)(1).

18

The maximum fine for each count is $250,000, pursuant to 18 U.S.C. § 3571.  A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2011 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).  The Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment are as follows:

Each of the offenses involve murder and are covered by §2A1.1.  It is noted that offenses committed under §2A1.1 are specifically excluded from grouping, pursuant to §3D1.2.  For each of Counts 1 and 2, the guideline for a violation of 21 U.S.C. § 848(e)(1)(A) is found in §2A1.1(a), which provides for a base offense level of 43.  Pursuant to §3D1.4, the combined multiple count adjusted offense level is 45, representing a two-level increase from the greatest of the adjusted offense levels for each group.  It is noted that the highest Offense Level

19

pursuant to the Sentencing Table is 43.

On September 8, 1993, Guerrero was arrested after investigation revealed that on September 4, 1993, he approached the complainant and struck him on the head with a handgun in front of 1683 Boston Road, Bronx, New York. On April 29, 1994, Guerrero was adjudicated as a youthful offender and received 30 days in custody and a $100 fine. Pursuant to §4A1.1(c), this conviction warrants one criminal history point.

On October 20, 1995, Guerrero and one other were arrested after they were found to be in possession of a napkin containing one plastic bag containing alleged crack cocaine. An additional 100 empty vials were also recovered from inside an automobile. On August 22, 1997, Guerrero was sentenced to three years to life imprisonment. Pursuant to §4A1.1(a), this conviction warrants three criminal history points.

The criminal convictions above result in a total of four criminal history points. According to the sentencing table at Chapter 5, Part A, four criminal history points establish a Criminal History Category of III.

20

Based on a total offense level of 43 and a Criminal History Category of III, the guideline range for imprisonment is life.

The guideline range for a term of supervised release is at least two years but not more than five years, pursuant to §5D1.2(a)(1). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to §5D1.1(a).

The Defendant is not eligible for probation because the instant offenses are Class A felonies, pursuant to §5B1.1(b)(1).

The fine range for the instant offense is $25,000 to $250,000 pursuant to §5E1.2(c)(3)(A). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7).

21

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is concluded that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553 (a)(2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. Under

22

18 U.S.C. § 3553 (a)(2)(B) & (C), the Court considers the need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.

According to the PSR, Guerrero is married to Maryanne Rivera, and that he and his wife have three children: Antonio, age 18; Raymond, age 15; and Hennessy, age 6. Guerrero has stated that his wife remains supportive of him and visits him every week. Prior to his arrest, the Defendant resided with his wife and children in Miami, Florida. As a result of the Defendant's incarceration, his wife and children moved back to New York in July 2010. Guerrero attended James Monroe High School in the Bronx, but left during tenth grade. Guerrero has explained that he left school because his first son was born in June 1992, so he felt he needed to work. The Defendant earned a GED while incarcerated in 1998. While not formally trained, Guerrero is skilled as a barber and has been cutting hair for many years.

Prior to his incarceration, the Defendant held several jobs. From 2007 until 2008, Guerrero was employed as a Project Leader for a company called National Vendor Service in Miami.

23

The Defendant reports that the company set up and maintained Lowe's home improvement stores and that he earned $17 per hour. From 2003 to 2007, Guerrero reportedly worked as a District Manager for a company called United Retail Services in Miami and earned about $40,000 per year. From 2002 to 2003, the Defendant was reportedly employed as a Project Manager for a company called Somerset Sales in Miami and earned $15 per hour. Guerrero has explained that this company, which is no longer in business, set up Home Depot stores. From 2001 to 2002, the Defendant reportedly worked as a jewelry maker at BMG Jewelry, located on Sixth Avenue in Manhattan and earned $12 per hour. From 1999 to 2001, the Defendant reportedly worked as a jewelry maker at Jeff Cooper Jewelry, located on Long Island and earned about $12 per hour. Guerrero, when asked what he would like to do in the future, has expressed an interest in studying to be an electrician or the HVAC field.

The Defendant's background illustrates his need to support his family and his ability to function in society. Recognizing the need under 18 U.S.C. § 3553 for a sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, Guerrero is sentenced to 25 years' imprisonment and five years'

supervised release on each count, with the sentences to run concurrently.

## The Sentence

For the instant offense, Guerrero is sentenced to 25 years' imprisonment and five years' supervised release on each count, with the sentences to run concurrently.

Guerrero is directed to report to the nearest United States Probation Office within 72 hours of release to commence his term of supervised release.  It is recommended that Guerrero be supervised by the district of his residence.

As mandatory conditions of his supervised release, Guerrero shall:

> (1)  not commit another federal, state, or local crime;
>
> (2)  not illegally possess a controlled substance;
>
> (3)  not possess a firearm or destructive device; and
>
> (4)  refrain from any unlawful use of a controlled substance.

The Defendant shall submit to one drug testing within fifteen (15) days of placement on supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special condition:

(1)     The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.    The search must be conducted at a reasonable time and in reasonable manner.    Failure to submit to a search may be grounds for revocation.    The Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

26

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for February 13, 2012.

It is so ordered.

**New York, NY**
**January  19 , 2012**

ROBERT W. SWEET
U.S.D.J.

27