UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA,

09 Cr. 339

   -against-

OPINION

ANTONIO GUERRERO a/k/a "Tony,"

               Defendant.

-------------------------------------X

A P P E A R A N C E S:

        Attorney for the Government

        PREET BHARARA
        United States Attorney for the
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        By:  Laurie Korenbaum, Esq.


        Attorney for Defendant Antonio Guerrero

        LAW OFFICE OF ROBERT J. KRAKOW, P.C.
        233 Broadway, Suite 2320
        New York, New York  10279
        By:  Robert J. Krakow, Esq.

**INDEX**

Page

I.    Background................................    1

II.   Prior Proceedings.........                    4

      A.   Guerrero's Initial Rule 29/33
           Motion.................                  4

      B.   The Instant Rule 29/33
           Motion.......................            5

           1.   The April 4, 2013 Hearing........    7

                a. Testimony of Detective Tota.....   8

                b. Testimony of Frederick Cohn, Esq.  10

                c. Testimony of James Dowd........   11

                d. Testimony of Special Agent Charles
                   Mulham............................  13

           2. Guerrero's *Brady* Challenge........   17

III.  There Was No *Brady* Violation.................  18

IV.   Guerrero's Trial Counsel Was Constitutionally
      Effective...............................       21

      A.    The Applicable Standard...............   22

      B.    The Trial Counsel Was Not Ineffective in Failing
            to Present a Two-Shooter Theory........   26

      C.    The Trial Counsel Was Not Ineffective In Failing
            to Explore Inconsistencies in the Trial Testimony
            and Evidence.........................    31

            1. Guerrero's Arrival at Minford Place...  32

            2. Locations of the Victims After the

i

Page

Shootings................................ 36

3.  Where Guerrero Was Dropped Off After
the Shootings........................... 38

4.  Guerrero's Confession the Day After
The Shootings.......................... 39

5.  Guerrero Cannot Establish Prejudice... 40

V.  Conclusion................................ 43

**Sweet, D.J.**


Defendant Antonio Guerrero ("Defendant" or "Guerrero") was convicted on June 7, 2010 of shooting to death two individuals, Fernando Garrido and Livino Ortega. Guerrero has moved for a judgment of acquittal pursuant to Fed. R. Cr. P. 29 ("Rule 29"), or in the alternative, for an order setting aside the jury's verdict and ordering a new trial pursuant to Fed. R. Cr. P. 33 ("Rule 33") (collectively, the "Rule 29/33 Motion"). Based upon the conclusions set forth below, the motion is denied.


## I. Background


This case arises out of the prosecution of members of the Solid Gold drug distribution organization for the September 3, 1994 murders of Livino Ortega ("Ortega") and Fernando Garrido ("Garrido"); the October 9, 1994 murder of Leonard Overman ("Overman") and non-fatal shooting of Alvino Wade ("Wade"); and the December 13, 1994 murder of Carmen Diaz ("Diaz") and non-fatal shooting of Genero Rodriguez ("Rodriguez"). The shootings all took place in the Bronx, and were perpetrated by members of Solid Gold in an effort to protect the organization's retail

1

crack cocaine business, which at that time was operating at 173rd
Street and Boston Road.  The relevant facts, derived from the
evidence presented at Guerrero's trial, are as follows:

> On September 3, 1994, Ortega, a
> crack dealer, and his friend, Garrido, were
> shot as they stood near a gas station on
> Minford Place and 173rd Street in the Bronx,
> within 100 feet of Solid Gold's drug spot.
> Both Ortega and Garrido died as a result of
> their gunshot wounds.
>
> The Solid Gold crew disfavored
> Ortega, who was selling crack cocaine in
> close proximity to the Solid Gold spot and
> who was directly competing with Solid Gold
> for customers. Additionally, Ortega had sold
> crack of an inferior quality using Solid
> Gold's packaging, thereby hurting Solid
> Gold's brand. As a result, members of the
> Solid Gold crew had several confrontations
> with Ortega.
>
> Solid Gold also had a dispute with
> Overman, a/k/a "Boo," who had operated the
> Solid Gold drug spot before Solid Gold's
> predecessor, Feliz. Since being released
> from jail, Overman had made it clear that he
> wanted the drug spot back for himself and
> his partner, Wade. At one point, [Solid Gold
> members] Ramon [Flores], Leonardo [Flores]
> and Guerrero armed themselves with guns from
> Guerrero's apartment and prepared to shoot
> at Overman and Wade from the rooftop of 1669
> Boston Road. Guerrero, who was on duty as
> manager that day, left to attend to the spot
> shortly before [Ramon and Leonardo Flores]
> shot at Wade as he walked below in the
> street. The attempt to shoot Wade was
> unsuccessful as he managed to evade the
> gunfire and get away.

After Overman assaulted Ricky, one
of the Solid Gold workers, members of Solid
Gold, including Miguel Padilla ("Padilla"),
Ramon [and] Leonardo [Flores,] and Guerrero
sought out Overman to kill him. Using a
white van, the crew planned to have Padilla
drive and Guerrero shoot Overman from the
vehicle. When the crew was unable to find
Overman, however, they returned to Boston
Road. Once there, the crew decided that,
since they were armed and prepared, they
might as well take the opportunity to kill
Ortega.

In preparation for the anticipated
shooting of Overman, Guerrero had armed
himself earlier that day with a 9 millimeter
firearm, which he had retrieved from his
apartment on Boston Road. Guerrero, his face
obscured by the hood of his sweatshirt,
walked to the corner of 173rd Street and
Minford Place and shot Ortega in the head at
close range. Guerrero then shot Garrido, who
had been standing with Ortega, in the back.
Guerrero then got into a white van that was
waiting for him down the block. Padilla, who
was in the driver's seat, drove a few blocks
away, where Padilla and Guerrero regrouped
with Ramon and Leonardo [Flores], who were
waiting there in Leonardo [Flores'] burgundy
car. Guerrero got in the burgundy car and
announced that "I killed him." Leonardo
[Flores] then drove away. Ortega, who
sustained three gunshot wounds, died on the
spot. Garrido, who sustained a single
gunshot wound to the back, died some hours
later at a hospital in the Bronx.

U.S. v. Guerrero, 882 F. Supp. 2d 463, 472-73 (S.D.N.Y. 2011)

("Guerrero IV").

3

## II.  Prior Proceedings

On April 7, 2009, Guerrero was indicted for the murders of Ortega and Garrido.  Dkt. No. 1.  The trial began on April 28, 2010, and on June 7, 2010 the jury found Guerrero guilty of both murders.

### A.  Guerrero's Initial Rule 29/33 Motion

On February 7, 2011, Guerrero submitted his initial Rule 29/33 motion, arguing that the evidence presented at trial was insufficient to support the jury's verdict and that his trial counsel ineffectively represented him in (i) failing to explore certain issues at trial including, *inter alia*, inconsistencies in the testimony given by Government witnesses at trial concerning how and by what means Guerrero arrived at the location of the double murder and the precise locations of the bodies of the murder victims; and (ii) failing to present testimony and evidence that would have allegedly undermined the testimony presented by the Government concerning how and by what means Guerrero arrived at the murder scene.

4

On December 1, 2011, the Court issued an opinion
denying Guerrero's motion, finding, *inter alia*, that the
decision by Guerrero's trial counsel not to explore the apparent
inconsistencies raised by Guerrero, either by cross-examination
of trial witnesses or by the presentation of additional
testimony and evidence, was strategically justified and
therefore did not constitute constitutionally ineffective
representation.  See Guerrero IV, 882 F. Supp. 2d at 489-92.

B.   The Instant Rule 29/33 Motion

On April 2, 2012, Guerrero submitted a second Rule
29/33 motion, which is the motion currently before the Court.
In his initial brief in support of the instant motion, Guerrero
contended that he received constitutionally ineffective counsel
at trial because his trial counsel neglected to explore
ballistics evidence that supported a two-shooter theory and
therefore would have raised a reasonable doubt as to the
Government's theory of the case, which identified Guerrero as
the lone shooter.  See Dkt. No. 142, Defendant Antonio
Guerrero's Memorandum in Support of His Supplemental Motion for
a Judgment of Acquittal or, In the Alternative, for a New Trial
Pursuant to Federal Rules of Criminal Procedure 29(c) and 33

5

("Def. Mem.") at 2.  Guerrero premised his argument principally
upon what he described as a "police ballistics report" which
described the bullet that was recovered from the victim Ortega's
clothing as a .38 caliber round.  See Def. Mem. at 5 and Ex. A
at 8.  Guerrero has contended that the description of this
bullet as a .38 caliber round demonstrates the presence of two
shooters at the murder scene, since several 9-millimeter shell
casings were also found at the scene and a 9-millimeter bullet
was found in victim Garrido's body.  Id. at 5-6.

On March 27, 2013, the Government submitted an
opposition brief to which it attached several documents as
exhibits, including a single page from a notebook maintained by
the detective who had been involved in the state investigation
into the murders of Garrido and Ortega.  See Dkt. No. 169,
Government's Pre-Hearing Memorandum of Law and Memorandum of Law
in Opposition to Defendant Antonio Guerrero's Third Post-Trial
Motion For Judgment of Acquittal Or a New Trial ("Gov. Opp."),
Ex. 11 (the "Erpedio Document").  The notes on that page
memorialize the detective's interview of Yokasta Santana, the
wife of murder victim Ortega.  Id.  According to the detective's
notes, during the course of the interview, Santana disclosed
that she had spoken with an individual whom she identified as

6

"Erpedio," and that Erpedio had told Santana that he had been present when Santana's husband, Ortega, had been shot. Id. The notes further disclosed that Erpedio had told Santana that "the *shooter* chased him [i.e., Erpedio] and fired three shots at him." Id. (emphasis added).

The Erpedio Document was submitted by the Government in connection with its opposition brief because the use of the singular term "shooter" by the eyewitness Erpedio disputed Guerrero's contention that his trial counsel was ineffective in failing to present a two-shooter theory at trial. See Gov. Opp. at 13 n. 5.

### 1.   *The April 4, 2013 Hearing*

On April 4, 2013, a hearing was held on the instant Rule 29/33 motion.  The Government called four witnesses – (i) Detective Anthony Tota ("Det. Tota"), a ballistics expert who examined the bullets and shell casings recovered in connection with the double murder; (ii) Frederick Cohn, Esq. ("Cohn" or "Trial Counsel"), the attorney who represented Guerrero at trial; (iii) James Dowd ("Dowd"), a private investigator who worked on Guerrero's case in conjunction with Guerrero's trial

7

counsel; and (iv) Special Agent Charles Mulham ("S.A. Mulham"), the case agent who oversaw the investigation of the double-murder.  Guerrero did not call any witnesses.

### a.  Testimony of Detective Tota

Detective Tota has been a ballistics expert for over forty years, working both with the NYPD and the Westchester County Police Department.  Transcript of April 4, 2013 Hearing ("Tr.") at 3-4.  In the course of his duties, Det. Tota has examined "tens of thousands" of firearms, bullets, bullet fragments and bullet casings.  Id. at 5.  With respect to the bullet recovered from the clothing of victim Ortega, Det. Tota testified that it "fits into the .38 caliber category, which includes 9-millimeter."  Id. at 9.  Det. Tota stated that this bullet could have been either a .38 caliber or a 9-millimeter round, and that no definitive classification could be made due, in part, to the fact that those two bullet-types are extremely similar and also the fact that the bullet recovered from Ortega's clothing was deformed.  Id. at 9-10, 12.  Det. Tota arrived at this conclusion after examining the bullet under a microscope.  Id. at 12.

8

Det. Tota also testified regarding the document that
Guerrero referred to as a "police ballistics report" in his
initial brief, see Def. Mem. at 5 & Ex. A at 8.  Det. Tota
stated that the document was not in fact a ballistics report,
but rather was a receipt that was filled out by another NYPD
ballistics examiner, Detective Thomas Natale, after Detective
Natale had retrieved the bullet from the coroner's office.  Tr.
at 10-11.  Det. Tota "assumed" that the typewritten portion of
the document (the "Ballistics Evidence Receipt") was filled out
by Detective Natale, who had not examined the bullet in a
laboratory as he was not the examiner assigned to the case.  Id.
at 11; see also id. at 27 (noting that to whatever extent Natale
examined the bullet recovered from Ortega's body, it was "an
examination at the Medical Examiner's Office without a
microscope or measuring tools").

Det. Tota also identified several 9-millimeter shell
casings recovered from the murder scene, which Det. Tota had
concluded all came from the same gun.  Tr. at 12-13.  Finally,
Det. Tota identified the bullet recovered from Garrido's body as
a "9-millimeter brass jacketed bullet."  Tr. at 14.  Det. Tota
explained that he was able to arrive at a definitive
determination as to the caliber of that round because it was not

9

as deformed as the round that had been recovered from Ortega's body.

b. *Testimony of Federick Cohn, Esq.*

Frederick Cohn, Esq., Guerrero's trial counsel, testified that he had considered raising the defense that there had been two shooters involved in the murders of Ortega and Garrido, but after consultation with his private investigator, James Dowd, Cohn had ultimately concluded that it was not a viable defense theory and that there was little, if any, evidence that he could present in support of such a theory. Tr. at 34-35. Instead, Cohn opted to present the defense theory that Guerrero was being framed just as others had framed Leonardo Flores years earlier in the state murder case in which Flores had been convicted of, *inter alia*, the murders of Ortega and Garrido. Id. at 35.

Cohn also testified that he and Dowd had discussed the ballistics evidence since Dowd had some expertise in the area of firearms. Id. at 36. In particular, Cohn and Dowd discussed the bullet that had been found in Ortega's clothing, and they

10

concluded that the precise caliber of that bullet could not be determined.  Id. at 37.

Cohn also testified that he was aware that there was evidence that a third person had been shot at by the shooter of Garrido and Ortega, that he did not recall ever being informed of the name of that person, and that he did not know whether Dowd had ever investigated someone by the name of "Experio." Id. at 42-43.

Finally, Cohn testified that to the extent that a two-shooter theory was ever alluded to in the trial testimony, Guerrero was identified as one of the shooters.  Id. at 48.

> c.  Testimony of James Dowd

James Dowd testified that he has been a criminal investigator for almost twenty years following his retirement from the NYPD with the rank of detective commander.  Tr. at 52. Dowd met with Guerrero "quite often" before the trial, and sought out Guerrero's advice as to where Dowd might find potential witnesses in the neighborhood where the double-murder occurred.  Id. at 54.

11

Dowd reviewed the ballistics evidence from the crime scene and did not conclude that the evidence indicated the presence of two shooters.  Id. at 55.  With respect to the Ballistics Evidence Receipt, which identified the round found in Ortega's clothing as ".38 cal," Dowd noted that a .38 caliber bullet and a 9-millimeter bullet "are very much the same," and therefore surmised that "[i]f it [i.e., the bullet] was disfigured in the shooting, he [i.e., Detective Natale, who filled out the Ballistics Evidence Receipt] probably put that down there as it could have been either one [i.e., a .38 caliber or 9-millimeter round]."  Id. at 56.

Dowd testified that Miguel Padilla, who was cooperating with the Government, had given numerous statements to the Government containing the assertion that that there was a third person on the street at the time that the double-murder occurred, and that these statements by Padilla had been part of the 3500 material[1] turned over to the defense.  Id. at 68-69. Dowd testified that he had attempted to locate the third person who had been at the crime scene, but did not recall the specifics of his investigative attempts.  Id. at 69.

---

[1] See 18 U.S.C. § 3500.

12

Finally, Dowd testified that Guerrero had given Dowd
the name "Experio" as an individual to investigate in the course
of Dowd's work on behalf of Guerrero's defense.  Id. at 70-71.
Dowd testified that he did in fact attempt to locate the
individual named "Experio," id. at 71, but was unable to do so,
id. at 69-70.


        *d.  Testimony of Special Agent Charles Mulham*


S.A. Mulham of the Bureau of Alcohol, Tobacco,
Firearms and Explosives, testified that he has been
investigating the murders of Garrido and Ortega since
approximately 2005.  Tr. at 73.  S.A. Mulham testified that 9-
millimeter shell casings were recovered in the immediate
vicinity of where the bodies of Garrido and Ortega were found by
NYPD officer Brad Ickes, who was the first officer on the scene.
Id. at 84-85.  S.A. Mulham, testifying with the aid of the
report produced by the NYPD Crime Scene Unit of the scene of the
double-murder, see Gov. Opp., Ex. 1, further testified that the
9-millimeter shell casings were all found on the west side of
the street, with four casings located in the immediate vicinity

13

of Ortega's body, and two more in the immediate vicinity of
Garrido's body.  Id.

Referring to the trial testimony of Officer Ickes,
S.A. Mulham testified that Ickes had spoken to Garrido at the
crime scene, and that Garrido had indicated that there was only
one shooter:

> [Ickes said to Garrido] I need you to tell
> me who did this to you.  And [Garrido] is
> like, No, I will get *him* myself.  And
> [Ickes] said, You might not be able to get
> him . . . [Garrido] says, No, If I have to,
> I will get *him* from the grave.

Id. at 85-86 (emphases added).

S.A. Mulham also testified about a statement made by
Garrido at the hospital following the shooting, which was
memorialized in a report filed Detective P.M. Smith, to whom
Garrido made the statement.  See Gov. Opp., Ex. 8 (the "DD-5").
S.A. Mulham stated that the DD-5 indicates that Garrido told
Detective Smith that he "heard numerous gunshots, saw *a male*
shooting at both he [i.e., Garrido] and [Ortega], [and that]
Garrido began to run and he felt a sharp pain in his back at

14

which time he fell to the ground." Id. at 89 (emphasis added).
S.A. Mulham also testified that there is no indication in the
DD-5 that an officer named "Lisanti" was present during
Detective Smith's bedside interview with Garrido. Id. at 87,
125-26.

S.A. Mulham also testified about notes contained in
the homicide file memorializing an interview by the case
detective of an individual named Willie Henry, who was a witness
to the shootings of Ortega and Garrido. See Gov. Opp., Ex. 10.
S.A. Mulham testified that according to the notes, Henry told
the police that he observed "a dark skinned male" commit the
shootings. Id. at 92. S.A. Mulham also testified that he
personally interviewed Henry in the course of his investigation,
and that Henry told S.A. Mulham that he observed only a single
shooter at the crime scene. Id. at 93, 128.

S.A. Mulham testified that during the course of his
review of the homicide file, he read the Erpedio Document, and
subsequently contacted Yokasta Santana in an attempt to get more
information about Erpedio. Id. at 93-94. However, Santana was
not able to give any further information as to Erpedio's
whereabouts, and though S.A. Mulham did make efforts to locate

15

the individual known as Erpedio, he was not successful.  Id. at
94.


S.A. Mulham was questioned about the apparent
inconsistency between the descriptions of the moments before the
shooting that were given by (i) Henry and Garrido on the one
hand, and (ii) Government witnesses Ramon Flores and Miguel
Padilla on the other hand.[2]  S.A. Mulham testified that since the
accounts given by Ramon Flores and Miguel Padilla were
consistent with those of Henry and Garrido with respect to the
significant aspects – "They put the players there.  They put
them there on that day.  They have the weapon right." Tr. at 129
– the "slight, small inconsistencies" between the different
recountings "are not the kind of issues that I kind of get hung
up on." Id. at 129-30.  S.A. Mulham additionally noted that
"you are not going to get a story sometimes that each person who
recounts things years later just falls into place like a
puzzle." Id. at 129-30.

---

[2] The accounts given by Henry, and Garrido (according to a
statement recorded by Officer Lisanti and attributed to Garrido)
indicated that the shooter exited from a van and immediately
began shooting.  See Gov. Opp., Ex. 9; Def. Mem., Ex. E.  The
accounts given by Ramon Flores and Miguel Padilla indicated that
the shooter was first dropped off around the corner from the
crime scene and then proceeded to walk around the corner and
begin shooting.  See Tr. 111-13, 121-22,

## 2. *Guerrero's* Brady *Challenge*

During the course of the April 4, 2013 hearing, Guerrero's counsel indicated that prior to the hearing he had not seen the Erpedio Document, and asserted that the Government's failure to produce the Erpedio Document to the defense prior to Guerrero's trial constituted a violation of Brady v. Maryland, 373 U.S. 83 (1963), see Tr. 43-44, in which the Supreme Court held that the Government has a constitutional obligation to disclose favorable evidence to the accused where such evidence is material to guilt or punishment.  Id. at 87; see also United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001).

At the close of the April 4, 2013 hearing, Guerrero's counsel requested that the Court permit additional briefing and argument as to whether the Government's failure to disclose the Erpedio Document prior to trial constituted a Brady violation. The request was granted, and the parties subsequently submitted post-hearing briefs addressing the Brady issue, as well as reiterating their respective positions as to the ineffective assistance arguments initially asserted by Guerrero.  See

17

Defendant Antonio Guerrero's Post-Hearing Memorandum In Support
of His Motion for a Judgment of Acquittal or, in the
Alternative, for a New Trial Pursuant to Federal Rules of
Criminal Procedure 29(c) and 33 ("Def. P-H Mem."); Government's
Post-Hearing Memorandum of Law in Opposition to Defendant
Antonio Guerrero's Motions for Judgment of Acquittal or a New
Trial ("Gov. P-H Opp.").  A hearing on the Brady issue was held
on June 4, 2013 which consisted of argument presented by the
parties, but no additional testimony.  The instant motion was
marked fully submitted at the close of the hearing.


## III.  There Was No *Brady* Violation


       Under Brady, the Government has a constitutional
obligation to disclose "evidence favorable to an accused . . .
where the evidence is material either to guilt or punishment."
373 U.S. at 87.  "[A] Brady violation occurs only where the
government suppresses evidence that 'could reasonably [have
been] taken to put the whole case in such a different light as
to undermine confidence in the verdict.'"  Coppa, 267 F.3d at
139 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).  For
Brady purposes, "[e]vidence is not 'suppressed' if the defendant
either knew, or should have known, of the essential facts

18

permitting him to take advantage of any exculpatory evidence."
U.S. v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993) (quoting U.S. v.
LeRoy, 687 F.2d 610, 618 (2d Cir. 1982), cert. denied, 459 U.S.
1174 (1983)) (quotation marks omitted).

Guerrero has contended that the Government's failure
to turn over the Erpedio Document constituted a Brady violation.
However, the essential information contained in the Erpedio
Document was known to Guerrero.  First, the Government had
disclosed to Guerrero that in addition to Ortega and Garrido,
there was a third person on Minford Place who was shot at during
the course of the double-murder.  See Tr. at 42, 68-69.  Second,
in preparing for his trial Guerrero himself had given the name
"Experio" to his private investigator, Dowd, and Dowd
subsequently "followed up" on that information by attempting –
unsuccessfully – to locate that individual.  See Tr. at 70-71.
In other words,  before the trial began Guerrero knew, *at a
minimum*, that (i) there was a third person who was shot at in
addition to Ortega and Garrido, and (ii) there was someone named
"Experio" who had information relevant to the double-murder.
Accordingly, the only piece of information potentially missing
from Guerrero's body of knowledge that could have been supplied

19

by the Erpedio Document is the linkage between these two facts,
*i.e.*, the fact that Erpedio was the third shooting victim.

Guerrero has contended that if he had been given the
Erpedio Document "he would have pursued an investigation of it."
Def. P-H Opp. at 12-13.  However, Guerrero has not explained how
his reaction to the information contained in the Erpedio
Document would have been any different than what Guerrero
actually did: instruct his investigator to locate an individual
named "Erpedio."  See Tr. at 70-71.  Guerrero also has not
explained why his investigator, who was unable to locate
Erpedio, would have had any more success in doing so had he been
armed with the Erpedio Document, which did not reveal anything
about the location or identity of the individual known as
"Erpedio."[3]

Accordingly, Guerrero's knowledge that (i) a third
person had been shot at in addition to Ortega and Garrido and
(ii) an individual named "Erpedio" had information relevant to
the double-murder, rendered him in possession "of the essential
facts permitting him to take advantage of any exculpatory

---

[3] The Government, which did have access to the Erpedio Document,
was also unable to locate Erpedio.  See Tr. at 94.

evidence," Zackson, 6 F.3d at 918, because the action taken by
Guerrero as a result of what he did know is no different than
what Guerrero would have done if the Government had disclosed
the Erpedio Document.  The Erpedio Document is therefore not
considered to have been "suppressed" for Brady purposes, and as
such no Brady violation occurred.  See id.


## IV.  Guerrero's Trial Counsel Was Constitutionally Effective


Guerrero has contended that the representation
provided by his Trial Counsel at trial was so ineffective as to
violate Guerrero's right to counsel under the Sixth Amendment.
Specifically, Guerrero has contended that the Trial Counsel was
ineffective in: (i) failing to argue a two-shooter theory based
upon ballistics and other evidence indicating that there were
two shooters at the crime scene rather than one, which would
have served to impeach the Government's witnesses and refute the
Government's theory of the case, Def. P-H Mem. at 17-20; (ii)
failing to adequately explore inconsistencies in testimony and
statements by Government witnesses and cooperators regarding the
crime scene, id. at 20-23; and (iii) failing to explore
additional inconsistencies in the trial testimony and statements
given by Government witnesses and cooperators, id. at 23-29.

21

However, as set forth below, to the extent that the Trial
Counsel did not address these issues, the "failures" identified
by Guerrero do not manifest a constitutional violation.


A.  The Applicable Standard


The Sixth Amendment provides that a criminal defendant
"shall enjoy the right ... to have the Assistance of Counsel for
his defense." U.S. Const. Amend. VI.  The Sixth Amendment
"right to counsel is the right to the effective assistance of
counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970).
The Supreme Court has established a two-part test for evaluating
claims of ineffective assistance. Strickland v. Washington, 466
U.S. 668, 687 (1984); accord Morales v. United States, 635 F.3d
39, 43 (2d Cir. 2011).  "First, the defendant must show that
counsel's performance was deficient. This requires showing that
counsel made errors so serious that counsel was not functioning
as the 'counsel' guaranteed by the Sixth Amendment."
Strickland, 466 U.S. at 687.  "Second, the defendant must show
that the deficient performance prejudiced the defense."  Id.
While the defendant must prove both deficient performance and
prejudice, "there is no reason for a court deciding an
ineffective assistance claim to approach the inquiry in the same

22

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Under Strickland's first prong, there is a strong presumption that the assistance rendered by an attorney is objectively reasonable. 466 U.S. at 688-89; Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) ("[J]udicial scrutiny of counsel's performance must be highly deferential") (quoting Strickland, 466 U.S. at 689). The performance inquiry examines the reasonableness of counsel's performance "from counsel's perspective at the time" and "considering all the circumstances." Strickland, 466 U.S. at 688, 689.

In this regard, it is well settled that "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009) (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and even strategic choices made after less than complete investigation do not amount to ineffective assistance-so long as the known facts made it reasonable to believe that further investigation was

23

unnecessary. Strickland, 466 U.S. at 690-91.  A reviewing court "must indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689) (quotation marks and alterations omitted).  Such deference is particularly appropriate when considering matters of trial strategy because reviewing courts are "ill-suited to second-guess" choices made by trial counsel. United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998).  Indeed, in making judgments about the effectiveness of counsel, the Second Circuit has "in case after case . . . declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996) (collecting cases).

Moreover, an attorney is under no obligation "to advance every nonfrivolous argument that could be made." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (citing Evitts v. Lucey, 469 U.S. 387, 394 (1985)); see also Jones v. Barnes,

24

463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy").

The second Strickland prong requires an affirmative showing of prejudice. 466 U.S. at 694-95; Gueits v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010). To satisfy this element of the Strickland analysis, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; accord United States v. Caracappa, 614 F.3d 30, 46 (2d Cir. 2010). "[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." United States v. Cronic, 466 U.S. 648, 659 n. 26 (1984). In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Wilson v. Mazzuca, 570 F.3d 490, 507 (2d Cir. 2009). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 694.

25

B.   The Trial Counsel Was Not Ineffective in Failing to
Present a Two-Shooter Theory

        Guerrero has contended that the Trial Counsel was
ineffective because he failed to use certain ballistics evidence
and other evidence in the record to advance a two-shooter
theory, which could have been used to impeach the testimony of
Government witnesses who stated that there was only a single
shooter as well as the Government's single-shooter theory of the
case.[4]  See Def. P-H Mem. at 20-23.

        The thrust of Guerrero's argument appears to be that
the ballistics and other evidence could have supported a two-

_____

[4] Guerrero has also contended that the Trial Counsel was
ineffective because he failed to focus the jury's attention on a
slight inconsistency in the descriptions of the murder weapon
found in the trial testimony and other evidence.  See Def. P-H
Mem. at 20 n. 11.  However, viewing the testimony and evidence
to which Guerrero has referred collectively, it offered a
unified description of a 9-millimeter Smith & Wesson handgun.
See Trial Tr. at 472 (testimony of Ramon Flores); Trial Tr. at
1235-56 (testimony of Leonardo Flores); Trial Tr. at 1044
(testimony of Jose Sanchez-Fernandez); Def. P-H Mem., Ex. A
(proffer statement of Miguel Padilla).  Accordingly, it was not
unreasonable for the Trial Counsel to conclude that any benefit
that might accrue to the defense by drawing the jury's attention
to the fact that the gun was alternately described as being
"nickel plated" or "black" would have been mitigated by the fact
that focusing on this evidence would have would have
"corroborated certain details of the Government's case,"
Guerrero IV, 882 F. Supp. 2d at 491, and thereby bolstered it.

shooter defense theory.  See Def. P-H Mem. at 20-23.  However,

on an ineffective assistance challenge, the salient question is

not whether the available evidence could have potentially

supported an alternate trial strategy, but rather turns on

whether the strategy that was ultimately adopted by trial

counsel was reasonable under the circumstances.  Strickland, 466

U.S. at 688-89; see also Harrington v. Richter, 131 S.Ct. 770,

790 (2011) (("After an adverse verdict at trial even the most

experienced counsel may find it difficult to resist asking

whether a different strategy might have been better . . . .

Strickland, however, calls for an inquiry into the objective

reasonableness of counsel's performance . . .").


     Trial Counsel testified that he did consider advancing

a two-shooter defense at trial, but ultimately opted not to

pursue that strategy because "[he] didn't think it was a viable

theory, [and] *tactically speaking* the only thing that would work

is if we tried to say people framed [Guerrero], the same way

they had framed somebody else many years before who did time for

the murder in state court . . . ."  Tr. at 34-35 (emphasis

added).  Trial Counsel also testified that in his preparation

for trial, he had noted that a certain piece of ballistics

evidence appeared to present a facial ambiguity as to the

27

caliber of a bullet found at the crime scene (and thereby
possibly suggest the use of two different guns), but that after
consulting with his private investigator – who was a retired
detective commander of the NYPD and therefore had substantial
knowledge of guns and ammunition, particularly with respect to
crime scenes - the idea "became discounted."  Tr. at 36-37.
Moreover, the Government has noted that the Trial Counsel
retained a ballistics expert who examined the ballistics
evidence prior to trial, but chose not to call the expert as a
trial witness.  Gov. P-H Opp. at 37 n. 14.

        In other words, Trial Counsel made the decision to
present a single-shooter theory to the jury because (i) after
consulting with his investigator and a ballistics expert, Trial
Counsel came to believe that the ballistics evidence did not
present a convincing case for a two-shooter theory, and (ii)
given that the Government presented numerous witnesses
testifying that the murders were committed by a single shooter –
i.e., Guerrero, see Guerrero IV, 882 F. Supp. 2d at 487-88,
Trial Counsel believed that the only viable chance of winning an
acquittal lay in trying to convince the jury that Guerrero was
being framed, just as Leonardo Flores had been framed for the
murders of Ortega and Garrido in a 1996 trial in New York state

28

court.[5]  It is therefore evident that Trial Counsel's decision to present a single-shooter theory was strategic in nature, was based upon a logical rationale, and was made after a reasonable exploration into the possibilities presented by the ballistics evidence.

Likewise, the Trial Counsel's decision not to utilize the other two pieces of evidence that Guerrero identifies as potentially supportive of a two-shooter theory is strategically defensible.  With respect to the notes of Officer Lisanti, which purport to reflect a statement made by Garrido at the hospital indicating that there were two shooters, see Def. P-H Mem., Ex. C, first, "[t]here is strategic justification for defense counsel's decision not to . . . introduce Garrido's death-bed statement" as recorded in the notes of Officer Lisanti, because it "would have . . . corroborated certain details of the Government's case [by] confirm[ing] that a white van was involved."  Guerrero IV, 882 F. Supp. 2d at 491.  Second, given

_____

[5] After a 1996 trial in the Supreme Court of the State of New York Bronx County, in which Leonardo Flores was convicted of murdering, inter alia, Ortega and Garrido, two eyewitnesses recanted and new evidence was discovered, leading to the overturning of the murder convictions.  Guerrero IV, 882 F. Supp. 2d at 470.  Leonardo Flores subsequently pleaded guilty in state court to acting as an accessory to the murders of Ortega and Garrido.  Id.

29

that it was never established that Officer Lisanti spoke
directly to Garrido, see Tr. at 87, 125-26, any support that
Officer Lisanti's notes could have lent to a two-shooter theory
would have been mitigated by (i) the DD-5, an official police
report which contained the notes of a detective who interviewed
Garrido, and definitively attributed to Garrido the statement
that "a male" was the one firing shots, see Gov. Opp., Ex. 8;
and (ii) the sworn trial testimony of Officer Ickes, who stated
that when he spoke to Garrido at the scene of the crime, Garrido
referred several times to a single shooter.  See Transcript of
Record ("Trial Tr.") at 117, United States v. Guerrero, No. 09
Cr. 339 (RWS) (S.D.N.Y. 2011).

     With respect to the trial testimony of Jose Sanchez-
Fernandez, while it is true he testified as to his belief there
were two shooters responsible for the murders of Ortega and
Garrido, it is crucial to note that Sanchez-Fernandez
specifically identified Guerrero as one of the shooters.  See
Def. P-H Mem. at 27-28 (quoting Trial Tr. at 1043-45).  There
was therefore a strategic basis for Trial Counsel's decision to
avoid calling further attention to Sanchez-Fernandez's version
of the murders.

Since "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel," Gibbons, 555 F.3d at 122, and since, as set forth above, the Trial Counsel's decision to forego a two-shooter theory was made on the basis of sound strategy and logic and after reasonable investigation into the feasibility of a one-shooter theory, see supra § IV(B), that decision does not constitute constitutionally ineffective assistance of counsel. Strickland, 466 U.S. at 690-91 (holding that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

C.  The Trial Counsel Was Not Ineffective in Failing to Explore Inconsistencies in the Trial Testimony and Evidence

Guerrero has contended that the Trial Counsel was constitutionally ineffective in failing to cross examine the Government's witnesses and/or bring to the jury's attention a number of purported inconsistencies in the trial testimony and other evidence in the record.  Specifically, Guerrero points to purported inconsistencies with respect to evidence regarding: (1) how Guerrero arrived at Minford Place on the night of the double-murder; (2) the locations of the victims after the

31

shooting; (3) where Guerrero was dropped off after the
shootings; and (4) a confession by Guerrero on the day after the
double-murder.  As set forth below, most of these
inconsistencies were in fact brought to the jury's attention by
the Trial Counsel, and Trial Counsel's failure to explore the
remainder does not constitute constitutionally ineffective
representation.

### 1.  Guerrero's Arrival at Minford Place

Guerrero has identified the following purported
inconsistencies in the testimony and evidence regarding the
details of Guerrero's arrival at Minford Place on the night of
the double-murder:

- The conflicting trial testimony of Ramon Flores and
  Leonardo Flores in terms of how Guerrero got to
  Minford Place and precisely where he was dropped
  off, see Def. P-H Mem. at 4, n. 3 (citing Trial Tr.
  at 473-7 7; 1239-40);

- The differences between Ramon Flores's first
  statement to Detective Clohessy upon being
  extradited back into the country and his testimony
  at trial in terms of the vehicle in which Guerrero
  travelled to Minford Place and where he was dropped
  off, see Def. P-H Mem. at 23 & Ex. E;

- The differences between the testimony given by Jose
  Sanchez-Fernandez and the statement given by Ramon
  Flores to Detective Clohessy in terms of who was

driving the vehicle that dropped off Guerrero and
who exited the vehicle on Minford Place, see id. at
27-28 (quoting Trial Tr. at 1043-45);

- The differences between the testimony of Leonardo
  and Ramon Flores and Miguel Padilla's proffered
  statement in terms of where Guerrero was dropped off
  relative to Minford Place and who was in the vehicle
  with Guerrero, see id. at 4 n. 3, 23 & Exs. A, E &
  G; and

- The differences between the state court testimony of
  Willie Henry and the testimony of Leonardo and Ramon
  Flores in terms of how Guerrero arrived at Minford
  Place, see id. at 6, n. 5-6 (citing Trial
  Transcript, People v. Mercado, at 1432).

With respect to the first three issues, although
Guerrero has contended that they were "never mentioned in
summation," Def. P-H Mem. at 5 n. 3, that is incorrect.  The
Trial Counsel dedicated a significant portion of his closing
argument to highlighting these inconsistencies to the jury, and
expressly argued that these pieces of evidence deserved little
weight as a result of the contradictions that Guerrero has
enumerated:

> Now, the Government in its summation gave
> you a version of what happened and if you
> think about it you will recall that this is
> Leo's testimony. That's what they're relying
> on. And all the other conflicts are ignored.
> [In contrast to Leo's testimony] Ramon says
> that Mike and Tony were in the van and Ramon
> and Leo were in Leo's car, that Tony was in

33

the passenger seat of the van, Mike says to
drop off Tony at Mama's Fried Chicken and
tells Leo to pick him up at Longfellow's in
front of the school. Debbie is in the
passenger seat and Tony and Ramon in back
and they drop Tony off and head towards
Minford. Ramon, of course, you'll remember
in his first story which he denied tells a
different story as there Mike is not alone
in the van and he had a passenger besides
Tony.

Now, that only came through Detective
Clohessy who had taken the first statement
and had dutifully written it down. And the
question I have for you is when did that
change and why? When did that first
testimony about circumstances surrounding
the murder and who did it and who took what
role, when did that change? But change it
did, because you know that his first
statement and what he testified to here were
not congruent. Leo said Tony was going to
run to 172 Street. Padilla was going to be
waiting for him and drive him to 172 and
West Farm after the shooting. Tony was
getting to the murders by going over the
rooftops and come out over at 173 Street.
Well, that's absolutely different. What
happened? Sanchez, who didn't see any of
this but is told stuff, Ramon tells Sanchez
the story which is as it comes through
Sanchez is different than Ramon's testimony
here. Leo is to be the getaway driver. Mike
and Tony will be the shooters. Tony and Mike
got out of the van and walked up the block
and shot everyone and got away.

Now, it's important because so much of the
government's testimony that they presented
from people who weren't there who didn't
participate and are giving statements to
everyone through everybody else. Can you

34

rely on this as evidence? It's legal
evidence because the judge let it in. *But
you shouldn't pay that much attention to it
because it doesn't agree.*

Trial Tr. at 3171-72 (emphasis added).


With respect to the latter two issues raised by
Guerrero, the Trial Counsel's failure to explore them is
defended as a strategic decision designed to avoid introducing
evidence that would have been highly damaging to the defense.
Miguel Padilla's proffer provided an explicit account of
Guerrero's execution-style murders of Ortega and Garrido.  See
Def. P-H Mem., Ex. A (stating that Guerrero "put[] [his] gun
against Livino [Ortega's] head and sho[t] him," and then
"sho[t] [Garrido] in the back").  It was reasonable for the
Trial Counsel to conclude that the harm to Guerrero's defense
that would have resulted from focusing the jury's attention on
these statements would have far outweighed the upside of being
able to point out inconsistencies between the Padilla proffer
and the testimony offered at trial.


Similarly, "[t]here is . . . a strategic justification
for defense counsel's decision not to call Willie Henry . . .

35

[since] Henry's testimony . . . that the shooter arrived at the crime scene in a white van, no on foot, would have . . . corroborated certain details of the Government's case, would have confirmed that a white van was involved." Guerrero IV, 882 F. Supp. 2d at 491.

### 2. Locations of the Victims After the Shootings

Guerrero has contended that the Trial Counsel was ineffective in failing to explore the inconsistencies between the descriptions of the crime scene found in the trial testimony of Officer Ickes and Miguel Padilla's proffer.  Def. P-H Mem. at 20-22.  In particular, Guerrero has noted that while Officer Ickes' testimony was that the bodies were both found on the same side of the street, Padilla's proffer stated that "[one] [b]ody on [the] sidewalk, another across [the] street in front of drug spot."  Id., Ex. A.  However, as noted above, Miguel Padilla's statement specifically identified Guerrero as having murdered Ortega and Garrido, and provided a detailed description of exactly how the murders occurred.  See supra § IV(C)(1). Accordingly, while it may be that focusing the jury's attention on this inconsistency could have had the effect of calling into question the general trustworthiness of Padilla's statement, it

36

would not have been unreasonable for the Trial Counsel to conclude that any such salutary effect would be counteracted by the damaging description of Guerrero shooting Ortega in the head and then turning his gun on Garrido and shooting him in the back as he tried to flee, see Def. P-H Mem., Ex. A.

Moreover, Guerrero's suggestion that the Trial Counsel should have engaged a crime scene expert to review the facts of the case because "[t]he location of the bodies suggests that Ortega and Garrido ran in opposite directions from the middle of the street," id. at 21, is belied by the coroner's testimony that the bullet hole in Ortega's head indicated that that the gun that shot him was "somewhere closer than 20 inches or so," Trial Tr. at 152-54, indicating that Guerrero shot Ortega immediately upon encountering him, without giving Ortega the opportunity to run. In addition, the crime scene diagram, which showed that Garrido's body was found up the block from Ortega's body, see Gov. P-H Opp., Ex. 1; Tr. at 83-85, is fully consistent with the Government's version of the crime, namely that Ortega was shot immediately upon encountering Guerrero, and then Garrido was shot in the back as he attempted to flee up the block.

37

### 3.  Where Guerrero Was Dropped Off After the Shootings

Guerrero has contended that the Trial Counsel was ineffective in failing to explore the inconsistency between Padilla's proffered statement and the trial testimony of Ramon Flores and Leonardo Flores as to precisely where Guerrero was dropped off after committing the double-murder.  Def. P-H Mem. at 6-7 n. 6.  However, the Trial Counsel did cross-examine Leonardo Flores on the inconsistency between his account and that of Ramon Flores:

> Q: You said you [dropped Guerrero off] at
> 171 and - just bear with me while I find
> that - 172 and West Farm?
> A: Yes.
> Q: Are you sure it wasn't Longfellow[, i.e.,
> where Ramon Flores testified Guerrero had
> been dropped off]?
> A: Maybe. I don't know the streets around
> there by heart. It was near West Farms or
> something like that.
> Q: Well, you were - was it part of the plan
> that you were to go to a specific place so
> you would meet the van, right?
> A: Yes.
> Q: And you are claiming now you don't know
> the streets so you don't know where it was,
> is that right?
> A: I know that it was one street over from
> Minford which is 172.  At the end of the
> street I don't know if that's Longfellow or
> West Farm.

38

> Q: But you testified pretty specifically on
> direct testimony that it was West Farm,
> right?
> A: Yes.
> Q: And do you know whether there is a school
> on Longfellow?
> A: I don't remember.

Trial Tr. 1343 (alterations added).

Furthermore, as noted above, the decision to avoid focusing attention on Padilla's proffer statement, even at the expense of losing the opportunity to point out inconsistencies, was logically sound, see supra § IV(C)(1).

### 4. Guerrero's Confession the Day After the Shootings

Guerrero has contended that the Trial Counsel was ineffective in failing to direct the jury's attention to an inconsistency between the testimony of Jose Martes, who stated that the day after the double-murder, Guerrero took part in a conversation with Ramon Flores, Martes and others on Boston Road in which Guerrero confessed to shooting Ortega and Garrido, and the testimony of Ramon Flores stating that neither he nor any of the other Solid Gold members returned to Boston Road for several days after the double-murder. Def. P-H Mem. at 24-25. However,

39

the Trial Counsel squarely addressed this issue in his closing

argument:

> Then there is Mr. Martes. The day after the
> murder he says this is the guy by the way
> who just appeared on the scene but everybody
> confides in everybody in this thing and he
> says that there's conversation in which they
> were discussing the murder before. And
> according to his testimony here Tony tells
> him exactly how he did it.
>
> Well, let's start with that. . . . But he
> says something else that doesn't square with
> somebody else, because you were told by
> somebody or other, and I forget who it is,
> that they stayed off the block the day after
> for two days after the shooting because the
> block was hot and Martes is absolutely
> certain that this happened the day after.
> Maybe it did, maybe it didn't, but how can
> you rely on it?

Trial Tr. at 3172-73.

### 5.  _Guerrero Cannot Establish Prejudice_

Even if, _arguendo_, the Trial Counsel's failure to

explore some or all of the inconsistencies enumerated by

Guerrero rendered his representation of Guerrero so egregiously

faulty as to fall below an objective standard of reasonableness,

and therefore satisfied the first prong of the Strickland

analysis, see 466 U.S. at 688-89, Guerrero's ineffective

40

assistance claim would nonetheless fail because he has not shown the prejudice required under Strickland's second prong, see id. at 694-95.

As this Court has previously noted with respect to the Trial Counsel's failure to cross-examine the Government's witnesses "on the means by which Guerrero arrived on the scene" of the double-murder:

> Even if Guerrero's contentions concerning the testimony of the Flores brothers, Mulham, Henry and Garrido did fulfill the first prong of the Strickland test, Guerrero's ineffectiveness claim does not establish substantial prejudice.  Janita Rosa, Martes and the Flores brothers all testified, based on their own knowledge or on statements Guerrero made to them, that Guerrero, a member of Solid Gold, agreed with other Solid Gold members to kill Ortega and Garrido with whom Solid Sold had an ongoing drug-related dispute, armed himself with a gun, obscured his face with a hooded sweatshirt, shot Ortega and Garrido and then fled in a white van driven by Padilla. Given this general agreement among the Government's witnesses concerning the theory of the crime, Guerrero has failed to establish that the verdict would have been different had defense counsel cross-examined Government witnesses on the means by which Guerrero arrived on the scene . . . .

41

Guerrero IV, 882 F. Supp. 2d at 491.  This reasoning applies
with equal force to the additional inconsistencies identified by
Guerrero that were not otherwise brought to the jury's attention
by the Trial Counsel, in that Guerrero has failed to demonstrate
that presentation of these issues to the jury would have been
sufficient to overcome the substantial volume of testimony
supporting the foundational facts of the Government's theory of
the crime.

42

## V.   Conclusion

Based upon the conclusions set forth above, no <u>Brady</u> violation occurred, and Guerrero has failed to show that the performance of the attorney who represented him at trial was so ineffective as to violate Guerrero's Sixth Amendment right to counsel.  Accordingly, Guerrero's Rule 29/33 motion is denied.

It is so ordered.

**New York, NY**
**August  6  , 2013**

_____
ROBERT W. SWEET
U.S.D.J.

43