UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,

                                    09 Cr. 339

    -against-

                             <u>AMENDED SENTENCING</u>
                                  <u>OPINION</u>

ANTONIO GUERRERO, a/k/a "Tony,"

                    Defendant.

------------------------------------X

<div style="border:1px solid black; padding:4px;">
USDC SDNY<br>
DOCUMENT<br>
ELECTRONICALLY FILED<br>
DOC #: _____<br>
DATE FILED: 10/2/14
</div>

<u>Attorney for the Government</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
By:  Laurie Korenbaum, Esq.
      Michael D. Maimin, Esq.


<u>Attorney for Defendant</u>

LAW OFFICE OF ROBERT J. KRAKOW, P.C.
233 Broadway, Suite 2320
New York, NY 10279
By:  Robert J. Krakow, Esq.

**Sweet, D.J.**

The defendant Antonio Guerrero ("Guerrero" or the "Defendant") was found guilty on June 4, 2010 after a six-week trial on two counts of intentional murder while engaged in a drug trafficking crime in violation of 21 U.S.C. § 848(e)(1). The sentencing opinion of January 19, 2012 ("Sentencing Opinion") provided that, subject to the sentencing hearing, the anticipated sentence was 25 years' imprisonment and five years' supervised release on each of the counts on which he was convicted, to run consecutively.  The relevant statutes and the United States Sentencing Guidelines ("Guidelines") have changed as a consequence of the enactment of the Fair Sentencing Act of 2010 (the "FSA") as interpreted in Dorsey v. United States, 132 S. Ct. 2321 (2012), giving rise to this Amended Sentencing Opinion.

For this judge, and I presume for most judges, sentencing is the most wrenching decision in a criminal trial, seeking the just balance between personal liberty and societal security.  The difficulty of the task is exemplified by the changes in the process over the years.  Prior to the Federal Sentencing Reform Act of 1984, the discretion of the sentencing judge was exercised within the statutory limits.  Thereafter,

1

the Guidelines established by the United States Sentencing
Commission (the "Commission") largely controlled the process.
After United States v. Booker, 543 U.S. 220 (2005), the
Guidelines became advisory and the § 3553 factors more
significant.  The FSA altered the threshold requirements of 21
U.S.C. § 841(b)(1)(A) and (B) and the Supreme Court in Dorsey v.
United States, 132 S. Ct. 2321 (2012) held the FSA to be
retroactive.

        The present challenge is determining the sentencing
regimen that should apply to Guerrero, validly convicted in
2010, pre-FSA, and now being sentenced post-Dorsey.  The parties
have provided much appreciated memoranda which have ably
illuminated the difficult problems presented.

        The issuance of this Amended Sentencing Opinion is
consistent with the practice this Court has adopted to assist
the parties at the sentencing hearing and to comply with the
notice provisions of Federal Rule of Criminal Procedure
32(i)(1)-(4).  In this instance, the Amended Sentencing Opinion
is particularly appropriate since it appears that the issues
presented here are of first impression.

As concluded below, the relevant guideline for murder and the 18 U.S.C. § 3553(a) factors constitute the appropriate sentencing regimen and result in the same sentence as was set forth in the Sentencing Opinion, subject to the sentencing hearing now scheduled for October 6, 2014.

## Prior Proceedings

On June 7, 2010, Guerrero was convicted of Counts One and Two of Indictment 09 Cr. 339, which charged him with the 1994 murders of Fernando Garrido and Livino Ortega, each in violation of 21 U.S.C. § 848(e)(1)(A).  On February 7, 2011, Guerrero filed a timely Rule 29/33 motion.  (Dkt. No. 114.) Following oral argument, and with the permission of the Court, Guerrero filed a "supplemental" memorandum of law.  (Dkt. No. 124.)  On December 1, 2011, Guerrero's motion was denied in its entirety.  (Dkt. No. 131.)  On January 20, 2012, the Sentencing Opinion was filed.  (Dkt. No. 134.)  At Guerrero's request, the Court adjourned sentencing from February 13, 2012, to April 9, 2012.  (Dkt. No. 137.)  On April 2, 2012, Guerrero, who had no Rule 29/33 motion pending at the time, filed another "supplemental" Rule 29/33 motion.  (Dkt. Nos. 140-42.)  After holding an evidentiary hearing and reviewing submissions from

3

both parties, on August 7, 2013, Guerrero's motion was denied.
(Dkt. No. 179.)

The Defendant submitted his Sentencing Memorandum on
April 18, 2014.  The Government submitted its Sentencing
Memorandum on August 14, 2014, and the Defendant filed his reply
on September 4, 2014.  The parties agreed upon October 6, 2014
for the hearing on the sentence.

**The Sentencing Framework, the Offense Conduct and the Relevant
Statutory Provisions**

The sentencing framework, the offense conduct and the
relevant statutes were set forth in the Sentencing Opinion and
remain applicable.

**The Contentions of the Defendant**

Guerrero seeks "voidance of the statutory minimum of
20 years" applicable to violations of 21 U.S.C. § 848(e)(1)(A)
(Guerrero Sent. Mem. 10), contending that: (1) 21 U.S.C. §
848(e)(1)(A) "include[s] as an element his participation in a
narcotics conspiracy under 21 U.S.C. [§] 841(b)(1)(A)" (Guerrero
Sent. Mem. 11); (2) the FSA increased the quantity of crack

4

cocaine required to trigger the enhanced penalty provisions from 50 grams to 280 grams (Guerrero Sent. Mem. 11); (3) pursuant to Dorsey, the FSA applies at any sentencing occurring on or after August 3, 2010, irrespective of the time of the commission of the crime (Guerrero Sent. Mem. 11); (4) pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000) and Alleyne v. United States, 133 S. Ct. 2151 (2013), any element of the offense must be found by a jury (Guerrero Sent. Mem. 11); (5) although the jury found a sufficient quantity of crack to satisfy the § 841(b)(1)(A) element at the time of the offense and trial — 50 grams — it did not find the 280 grams required to trigger § 841(b)(1)(A) after the FSA (Guerrero Sent. Mem. 12); (6) therefore, "Guerrero is entitled to be sentenced as though the requisite element of the underlying narcotics conspiracy pursuant to 21 U.S.C. [§] 841(b)(1)(A) had not been established at all" (Guerrero Sent. Mem. 12); and (7) "the redesignation of the minimum quantity of crack serves to void the 20 year statutory minimum here, where a 280 gram threshold was neither charged nor found by a jury." (Guerrero Sent. Mem. 11.)  Accordingly, Guerrero asks to be sentenced without reference to a mandatory minimum and "by analogy to crimes for a murder."  (Guerrero Sent. Mem. 12.)

**The FSA and *Dorsey* Do Not Affect the Conviction**

The conviction of Guerrero on June 7, 2010 was under a valid statute and post-trial motions have not established any infirmity in the trial proceedings.

21 U.S.C. § 848(e) provides, in relevant part, that:

> . . . any person engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death . . . .

21 U.S.C. § 848(e)(1)(A). At the time that Guerrero murdered Garrido and Ortega and, indeed, up until August 3, 2010, which was nearly two months after a jury convicted Guerrero of those murders, an offense punishable under 21 U.S.C. § 841(b)(1)(A) included the distribution or possession with intent to distribute 50 grams and more of cocaine base, in a form commonly known as "crack," or participation in a conspiracy to do so. See 21 U.S.C. §§ 841(b)(1)(A)(iii), 846 (1993).

The FSA, which was subtitled "An Act to restore fairness to Federal cocaine sentencing," sought, primarily, to

6

reduce sentencing disparities for defendants convicted of federal crimes involving cocaine, on the one hand, and cocaine base on the other, by requiring larger quantities of cocaine base to be proved to merit the enhanced sentencing provisions pursuant to 21 U.S.C. § 841(b)(1).  First, the FSA increased the threshold quantities of cocaine base necessary to trigger the enhanced sentencing provisions set forth in 21 U.S.C. §§ 841(b)(1)(A) & (B) from 50 grams to 280 grams ((b)(1)(A)) and from 5 grams to 28 grams ((b)(1)(B)).  FSA § 2.  Second, the FSA eliminated mandatory minimum sentences for simple possession of cocaine base.  FSA § 3.  Third, the FSA increased the maximum fines applicable to defendants who qualified for enhanced sentencing pursuant to 21 U.S.C. §§ 841(b)(1)(A) & (B) and 960(b).  FSA § 4.  Fourth, the FSA directed the Commission to increase the Guidelines applicable where a defendant "used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense."  FSA § 5.  Fifth, the FSA directed the Commission to increase the Guidelines applicable to defendants who engaged in additional aggravating conduct.  FSA § 6.  Sixth, the FSA directed the Commission to cap the applicable Guidelines offense level at 32 for minimal participants in the drug crime, and to reduce the Guidelines for a very narrow range of defendants.  FSA § 7.

Seventh, the FSA required the Commission to "promulgate the
guidelines, policy statements, or amendments provided for in
this Act as soon as practicable, and in any event not later than
30 days after the enactment of this Act," providing "emergency
authority" to do so.  FSA § 8.  Eighth, the FSA required the
Commission to analyze and report on the efficacy of "drug
courts" within one year.  FSA § 9.  Ninth, the FSA required the
Commission to analyze and report on the changes to the Federal
sentencing laws set forth in the FSA within five years.  FSA §
10.  The FSA did not address 21 U.S.C. § 848(e); however,
§ 848(e) explicitly references § 841(b), which was altered by
the FSA.

Guerrero's conviction remains standing, unchallenged
by the subsequent changes in the statute under which he was
found guilty.  What remains to be concluded is whether under
Dorsey the FSA applies to the sentencing of Guerrero and if so,
the effect of that application.

**Section 848(e)(1)(A) is Properly Read to Adopt the Most Current
Form of Section 841(b)(1)(A) at the Time of Conviction**

To resolve statutory construction issues, the Court
must first turn to "the statute's plain meaning, if it has one."

8

United States v. Dauray, 215 F.3d 257, 260 (2d Cir. 2000)

(citing United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir.

1994)); see Community for Creative Non-Violence v. Reid, 490

U.S. 730, 739 (1989).  If the statute lends itself to two or

more meanings, then canons of statutory interpretation are used

to resolve the ambiguity.  Dauray, 215 F.3d at 262 (citing

United States v. Turkette, 452 U.S. 576, 581, 101 S.Ct. 2524, 69

L.Ed.2d 246 (1981)).  "[C]anons [of statutory interpretation]

are not mandatory rules.  They are guides that 'need not be

conclusive.'"  Chickasaw Nation v. United States, 534 U.S. 84,

94, 122 S. Ct. 528, 535, 151 L.Ed.2d 474 (2001) (quoting Circuit

City Stores, Inc. v. Adams, 532 U.S. 105, 115, 121 S.Ct. 1302,

149 L.Ed.2d 234 (2001)).  If the plain meaning and canons of

statutory interpretation fail to resolve statutory ambiguity,

the Court will then turn to legislative history.  Dauray, 215

F.3d at 264.


        Section 848(e)(1)(A) established as an independent

criminal offense "engaging" in a crime "punishable" under

§ 841(b)(1)(A) and uses the present tense in describing when the

crime occurs.  See, e.g., United States v. Collazo-Aponte, 216

F.3d 163, 199 (1st Cir. 2000), vacated on other grounds, 121 S.

Ct. 1996 (2001), remanded to 281 F.3d 320 (1st Cir. 2002); see

also United States v. Honken, 541 F.3d 1146, 1155-56 (8th Cir. 2008).

An examination of the tenses of § 848(e)(1)(A) suggests the incorporation of the § 841(b)(1)(A) terms in effect at the time of the crime or conviction.  "In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . words used in the present tense include the future as well as the present."  1 U.S.C. § 1.  "[A]ll laws, including penal statutes [are generally] written in the present tense."  Carr v. United States, 560 U.S. 438, 463, 130 S.Ct. 2229, 2245, 176 L.Ed.2d 1152 (2010).  It is "widely accepted modern legislative drafting convention that a law should not be read to speak as of the date of enactment."  Id.  560 U.S. at 463, 130 S.Ct. at 2244, 176 L.Ed.2d 1152.  Under this analysis, § 848(e)(1)(A) should be read to include the pre-FSA § 841(b)(1)(A) at the time of conviction, removing any doubt about the validity of Guerrero's conviction.

### *Dorsey* Controls the Sentencing of Guerrero

Dorsey does not explicitly address the question before this Court today: whether the FSA, by fair implication, provided

10

for § 848(e)(1)(A) to be amended retroactively along with § 841(b)(1)(A); or, in other words, whether the heightened criminal penalties of § 848(e)(1)(A) can be applied where the jury's findings no longer satisfy the post-FSA § 848(e)(1)(A) requirements and, if not, which sentencing regimen should be employed.

Dorsey addresses when certain defendants are subject to enhanced penalties under § 841(b), not whether defendants are criminally liable at all.  132 S. Ct. at 2335 ("we conclude that Congress intended the Fair Sentencing Act's new, lower mandatory minimums to apply to the post-Act sentencing of pre-Act offenders").  The Government contends that § 848(e)(1)(A) creates an independent crime – murder while engaging in a drug offense – and does not prescribe an enhanced penalty for § 841(b).

However, the fact that § 848(e)(1)(A) has been found to be a separately punishable offense for the purposes of double jeopardy, see Honken, 541 F.3d at 1155, does not force the conclusion that it cannot also serve a sentence-enhancing function, and therefore, that Dorsey does not apply.  In fact, § 848(e)(1)(A) is best described as a sentencing-enhancement

11

statute that also establishes a separate punishable offense.
See, e.g., United States v. Walker, 142 F.3d 103, 113-14 (2d
Cir. 1998) (noting that § 848(e)(1)(A) provides for enhanced
sentencing).  While it creates a separate basis for liability,
this provision, plainly titled "Death Penalty," subjects
defendants to a more severe penalty than ordinarily imposed for
murder other than murder in the first degree precisely because
they have participated in a drug offense in conjunction with the
murder, inter alia, § 841(b)(1)(A).

        The drug quantity thresholds triggering mandatory
minimum sentences are elements of the offenses, which in a trial
context, must be found by a jury.  See Alleyne, 133 S. Ct., at
2158; see also Apprendi, 530 U.S., at 483.  The FSA and the
subsequent revision of the Guidelines altered the 20 year
statutory minimum at sentencing for violators of 21 U.S.C. §
841(b)(1)(A).  Since the "requisite quantity of drugs" must be
proved to establish the predicate narcotics conspiracy for
purposes of 21 U.S.C. § 848, see, United States v. Martinez-
Martinez, No. 01 Cr. 307, 2001 WL 1287040, *2 (S.D.N.Y. Oct. 24,
2001), then for purposes of 21 U.S.C. § 848(e)(1)(A), Guerrero
cannot be sentenced because the requisite element of 21 U.S.C. §
841(b)(1)(A) has not been established.  Current law requires a

jury finding of at least 280 grams of crack cocaine base and the law at the time Guerrero was convicted was merely 50 grams.[1]

The Supreme Court ruled in Dorsey that the FSA is retroactive with respect to sentencing under 21 U.S.C. § 841(b)(1)(A) because Congress intended to remedy the disparate sentencing treatment of defendants who had not been found to conspire with respect to the 280 grams of crack cocaine required under the FSA and applicable to the narcotics conspiracy.  It is a fundamental principle of our judicial system that "the hierarchical structure of Article III dictates that inferior courts faithfully apply the precedents of superior courts, just as the hierarchical structure of Article II requires executive officials to follow presidential precedents."  World Wrestling Entm't, Inc. v. Jakks Pacific, Inc., 425 F. Supp. 2d 484, 498-99 (S.D.N.Y. 2006) (internal citation omitted); see also State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) (affirming that lower courts are bound to follow precedent); Agostini v. Felton, 521 U.S. 203, 207 (1997) ("[L]ower courts should follow the case which directly controls, leaving to [the Supreme Court] the

---

[1] The Government has accurately pointed out that the evidence at trial established that the Solid Gold drug conspiracy involved more than 280 grams of crack.  (Gov't Sentencing Mem. 12 n. 7.)  However, that finding was not submitted to or made by the jury.  Cedeño, a co-conspirator of Guerrero's, in Superseding Indictment No. S-2 (Dkt. No. 130), is charged in a 280 gram conspiracy.

prerogative of overruling its own decisions."); Balintulo v.
Daimler AG, 727 F.3d 174, 190 (2d Cir. 2013) ("Lower courts are
bound by [Supreme Court precedent] and they are without
authority to reinterpret the Court's binding precedent in light
of irrelevant factual distinctions . . .") (internal quotations
omitted).

In short, this Court is bound to effectuate faithfully
as best it can the central holding of Dorsey, and it will do so
here.  Although here 21 U.S.C. § 841(b)(1)(A) functions only as
the underlying narcotics conspiracy element, Dorsey's logic
still applies.  The effect of Dorsey's retroactivity in the
absence of proof of a conspiracy involving 280 grams is to
eliminate the mandatory minimum provision of § 841(b)(1)(A).

The Government has contended that the factors
enunciated in Dorsey "all militate against finding that Congress
fairly implied that it intended § 848(e)(1)(A) to be amended
retroactively."  (Gov't Sentencing Mem. 19.)  However, the two
Dorsey factors discussing the Sentence Reform Act and the FSA
are just as applicable to sentences under § 848(e)(1)(A) as
under § 841.  In considering these factors, the Supreme Court
reasoned that the language of the FSA fairly implies that

14

"Congress intended to follow the Sentencing Reform Act['s special and different] background principle" favoring imposition of a criminal penalty "in effect at the date the defendant is sentenced." Dorsey, 132 S. Ct. at 2332. The Commission did not need to amend the language of § 848(e)(1)(A) in order to effectuate Congress's policy as set out under these two Dorsey factors. Rather, the Commission changed § 841(b)(1)(iii)'s crack cocaine threshold, from which § 848(e)(1)(A) derives its own threshold. In sum, these two Dorsey factors support the following conclusion: whether a defendant is being sentenced for distribution of drugs or murder in furtherance of a conspiracy to distribute drugs, a court must consider the applicable guidelines at the time of sentencing. The enhanced penalty under § 848(e)(1)(A), as governed by the post-FSA version of § 841(b)(1)(A)(iii), requires a jury finding that the defendant committed a murder in furtherance of a drug conspiracy to sell 280 or more grams of crack cocaine. Since the jury here did not return this finding, § 848(e)(1)(A)'s more severe sentencing provisions will not be applied.

The Government contends that the "imposition of disparate sentences" factor articulated in Dorsey does not apply to the instant case because "the FSA does not adjust the

mandatory minimum sentence applicable to a Section 848(e)(1)(A) offense." (Gov't Sentencing Mem. 20.) Under this factor, the Supreme Court addressed "the imposition of . . . disparate sentences involv[ing] roughly contemporaneous sentencing . . . thereby highlighting a kind of unfairness that modern sentencing statutes typically seek to combat." Dorsey, 132 S. Ct. at 2333. While the FSA did not institute a new mandatory minimum sentence, it raised the amount of crack required for a § 841 prosecution, which in turn raises the amount of crack required to be prosecuted under § 848(e)(1)(A). Thus, if retroactivity were not to apply, a pre-Act offender with jury finding of 50 grams of crack would be subject to § 848(e)(1)(A)'s mandatory minimum, while a post-Act offender with a jury finding of 50 grams of crack – or anything under 280 grams - would not be subject to § 848(e)(1)(A)'s mandatory minimum. Indeed, two individuals with the same number of prior offenses who each engaged in the same criminal conduct involving the same amount of crack as determined by a jury could receive completely different sentences. See id.

The Government further contends that Dorsey's "disproportionate status quo" consideration does not apply because "the FSA did not find or attempt to address any

'disproportionate status quo' among murderers." (Gov't
Sentencing Mem. 20.) This appears to conflict with <u>Dorsey</u>'s
central observations. The FSA, by recalibrating crack and
powder cocaine ratios from 100 to 1 to 18 to 1, does address a
disproportionate status quo among murderers by seriously
limiting the pool of defendants eligible to be prosecuted under
§ 848(e)(1)(A). To conclude that Congress meant to ameliorate
disparities between defendants for drug offenses, but uphold the
disparities when it came to enhanced penalties for murders tied
to those same drug offenses, does not correspond to the purposes
behind the enactment of FSA, as interpreted by <u>Dorsey</u>. It is
inappropriate to generate disproportionate sentencing where no
clear exception has been provided for by statute or by the
Supreme Court.

Finally, the Government contends that the Supreme
Court's last consideration – whether there was a "strong
countervailing consideration" to retroactive application of the
FSA's amendment – is not applicable to the case at bar because
"Congress specifically intended to <u>increase</u> penalties for
defendants who were otherwise involved in violence." (Gov't
Sentencing Mem. 21 (emphasis in original).) This contention
also departs from <u>Dorsey</u>'s basic interpretation of the FSA: that

17

the FSA is concerned with disparities between crack and powder cocaine, and brings the penalties faced by individuals engaged in criminal activity relating to crack more in line with those faced by similarly situated individuals dealing in powder cocaine.  The fact that Congress was generally concerned about violence does not alter Dorsey and the FSA's baseline principles.  On its face, § 5 of the FSA articulates no imperative to differentiate between the increase in penalties for violence depending on whether the underlying drug offense involves crack or cocaine.  Section 5 simply states that the Commission shall review and amend the Guidelines to ensure that the Guidelines "provide an additional penalty increase of at least 2 offense levels if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense."  FSA § 5.  Section 5 does not provide a countervailing consideration to the FSA's retroactive application to § 848(e)(1)(A).

To effectuate the holding of Dorsey, which interprets the FSA as a sentencing reform act, Dorsey will be applied to Guerrero's sentencing.

18

In the absence of § 848 guidelines for the reasons concluded above, the murder guidelines are applied.

## The Murder Guidelines

The Second Circuit has held that murder while engaging in a drug conspiracy in violation of § 848(e)(1)(A) has four elements: (i) the defendant must have engaged in the alleged narcotics conspiracy; (ii) the drug conspiracy must have involved at least the quantity of drugs set forth in 21 U.S.C. § 841(b)(1)(A); (iii) while engaging in the drug conspiracy involving the statutory quantity of drugs, the defendant must have intentionally killed, or counseled, demanded, induced, procured or caused the intentional killing of another person; and (iv) the killing of that other person must have actually resulted from the defendant's actions.  United States v. Walker, 142 F.3d 103, 113 (2d Cir. 1998); United States v. Martinez-Martinez, No. 01 Cr. 307, 2001 WL 1287040 (S.D.N.Y. Oct. 24, 2001).  An analogous crime is second degree murder.  18 U.S.C. § 1111 states:

> Murder is the unlawful killing of a human being with
> malice aforethought.  Every murder perpetrated by
> poison, lying in wait, or any other kind of willful,
> deliberate, malicious, and premeditated killing; or
> committed in the perpetration of, or attempt to

19

perpetrate, any arson, escape, murder, kidnapping,
treason, espionage, sabotage, aggravated sexual abuse
or sexual abuse, child abuse, burglary, or robbery; or
perpetrated as part of a pattern or practice of
assault or torture against a child or children; or
perpetrated from a premeditated design unlawfully and
maliciously to effect the death of any human being
other than him who is killed, is murder in the first
degree.

Any other murder is murder in the second degree.

Analogy to the guidelines for First Degree Murder
under 18 U.S.C. § 1111 is inappropriate in this case because, in
order to prove murder in the first degree, the government must
establish, among other things that the "defendant acted with
premeditation." See Modern Federal Jury Instructions at 41-2,
41-5. No such instruction was given to the jury in this case
and, as such, premeditation was not proven beyond a reasonable
doubt. Instead, the jury was asked to consider whether Guerrero
"intentionally killed a person specified in the indictment or
counseled, induced, procured or caused the intentional killing
of that person." (Tr. 3370.)

Analogy to Second Degree Murder, however, is
appropriate in these circumstances. The Defendant contends that
malice aforethought and intent to kill may not be treated as
analogous and that the guidelines for manslaughter should

20

therefore be applied.  (See Guerrero Sentencing Mem. 13.)
However, case law would suggest otherwise.

The malice aforethought requirement of 18 U.S.C. §
1111, which applies to both murder in the first and second
degree, is strongly analogous, albeit not identical, to the
"intentionally killed" element in § 848(e)(1)(A).  See Schad v.
Arizona, 501 U.S. 624, 640 (1991) ("At common law, murder was
defined as the unlawful killing of another human being with
'malice aforethought.'  The intent to kill and the intent to
commit a felony were alternative aspects of the single concept
of 'malice aforethought.'") (internal citations omitted); see
also United States v. Regnier, 44 F. App'x 524, 528 (2d Cir.
2002) (malice aforethought may also be found "from the intent to
commit a felony").  The "malice aforethought" element in Second
Degree Murder may be satisfied with "intent-to-kill without
premeditation and deliberation."  Id. (quoting United States v.
Pearson, 159 F.3d 480, 486 (10th Cir. 1998) ("[S]econd degree
murder's malice aforethought element is satisfied by: (1)
intent-to-kill without the added ingredients of premeditation
and deliberation; (2) intent-to-do serious-bodily-injury; (3)
depraved-heart; or (4) commission of a felony when the felony in
question is not one of those specified in the first degree

21

murder paragraph of § 1111(a).")).  The Government has
sufficiently proved malice aforethought by proving intent to
kill.

As such, the Second Degree Murder Guidelines are
appropriately applied here.

**Application of the Second Degree Murder Guideline**

Guerrero contends that the Pre-Sentence Report and the
Sentencing Opinion inappropriately calculated his Criminal
History Category as level III as a result of Guerrero's prior
conviction on October 20, 1995 in the Bronx of Criminal
Possession of a Controlled Substance 2nd degree, because that
conviction was part of the charged conspiracy.  The record in
this case contradicts his position.

Prior to trial, the Government moved in limine for a
ruling allowing it to elicit testimony and offer proof of
Guerrero's possession of cocaine and crack vials at Boston Road
and 174th Street in October 1995, a spot then being used by
Guerrero and his workers to sell crack cocaine.  (Dkt. No. 56 at
28-29).  The Government did not offer this evidence as proof of

22

the Solid Gold drug conspiracy because, by that time, Guerrero had had a falling-out with Ramon Flores and was no longer working for Solid Gold.  (Tr. 614-16).  Ramon Flores testified that Guerrero stopped working for Solid Gold a few months after he committed the September 3, 1994 double homicide, and that, by 1995, Guerrero was no longer working at the Boston Road Spot. (Tr. 616).  The falling-out occurred when Guerrero started "selling his own crack with [Flores's] vials." (Tr. 616).

The Government specifically offered evidence of this incident as corroboration of "testimony by cooperating witnesses about why Guerrero, a trusted member of Solid Gold, ceased involvement with that crew in approximately 1995 and was not involved in future criminal endeavors of Solid Gold ...." (Dkt. No. 56 at 29).  Ultimately, the Court denied the Government's request to introduce evidence of the arrest, with the determination that "Guerrero's arrest with 1,000 crack/cocaine vials is not relevant to the conspiracy." United States v. Guerrero, No. 09 Cr. 339, 2010 WL 1506548, *11 (S.D.N.Y. Apr. 14, 2010).  Thus, Guerrero's possession conviction is not part of the charged conspiracy.

The arrest and the conviction stemming from this arrest, yielding three criminal history points, are properly calculated as part of Guerrero's criminal history, and Probation was therefore correct in placing Guerrero in Criminal History Category III.

The Guidelines applicable to Second Degree Murder, as adopted for the reasons set forth above, provide for a base offense level of 38, which is then increased two levels pursuant to §3D1.4.  A Criminal History Category of III is appropriate for the reasons set forth above and in the Sentencing Opinion. Based on a total offense level of 40 and a Criminal History Category of III, the Guideline range for imprisonment is 360 months to life.

**The § 3553 Factors**

The Sentencing Opinion contained the conclusions of the Court with respect to the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C.

§ 3553(a)).  These conclusions have not changed since January 19, 2012, the date of the Sentencing Opinion.

The Guerrero family circumstances are laudable and the probability of Guerrero's return to drug trafficking is unlikely.  Murder, however, strikes at the fabric of society. Murder to protect the territoriality of an illegal enterprise turns city streets into a shooting gallery.  Subsequent good conduct can mitigate, but not erase, the effect of these murders.  The below-Guideline sentence of 25 years balances these § 3553 factors as set forth in the Sentencing Opinion. (See Sentencing Op. 24.)

CASE 1:09-cr-00339-RWS   Document 196   Filed 10/02/14   Page 27 of 27

**The Sentence**

        The sentence set forth in the Sentencing Opinion remains applicable, as clarified by this Amended Sentencing Opinion.  The terms of this sentence are subject to modification at the sentencing hearing scheduled for October 6, 2014.

        It is so ordered.

**New York, NY**
**October  2,  2014**

                        Robert W. Sweet
                            U.S.D.J.